## H. B. Wells v. Jackson Iron Manufacturing Company.

Where the court makes an order that a party shall do certain things preparatory to a trial, within a limited time, as terms of a continuance, or where
the party, in order to obtain such continuance, makes a voluntary agreement to do the same things within the same time, such party may be relieved from the operation of such order or from the effect of such agreement, when it is made to appear that such order or agreement was made
under a mistake or misapprehension of the real facts in the case.

There can be no constructive possession of land without color of title.

If the plaintiff's grantor, having color of title to lot A., enters upon any part
of that lot, this gives him constructive possession of the whole lot; and that
would give the plaintiff, his grantee, such seisin of the whole lot that he
could maintain a writ of entry against one entering upon any part of said
lot without title.

But if plaintiff's grantor, having color of title to lot A. only, makes an entry
upon lot B., and takes possession of a part of it, and afterwards conveys
lot A. only, to plaintiff, the plaintiff thereby acquires no right to, or seisin
of, lot B.

If one should take possession of the summit of Mount Washington, and then
convey the same specifically, or the lot or grant which contains it, to the
plaintiff, he may maintain a writ of entry against any one subsequently
entering without right upon said summit.

But if the plaintiff's grantor, having taken possession of the summit of Mount
Washington, conveys to plaintiff some other lot, which does not include
such summit, the plaintiff can take no benefit from his grantor's possession
of lands which he has not conveyed to him.

In this case, plaintiff's grantor having color of title to Thompson & Meserve's
Purchase from one who had made an entry thereon, entered upon the summit of Mount Washington and afterwards conveyed Thompson & Meserve's Purchase to the plaintiff; the plaintiff had never been in possession of the summit of the mountain, and he introduced no evidence tending to show that said summit was within the limits of said Purchase:
*Held* that the plaintiff could not maintain a writ of entry for the summit of
Mount Washington.

An entire stranger to a title,—one who shows no interest whatever in the
premises,—is not in a position to object to the title of his opponent. But
when he shows himself interested in the title to the premises, he may then
require his opponent to show not only an authority to convey and a conveyance under it, but that the authority under which the sale was made was
strictly pursued.

The statute of July 4, 1829, was properly complied with by the deputy
secretary of State, in sending back to the collector of taxes the copy of the
warrant which had been sent to him.

Where a deed may properly be recorded in two places or offices, and is so recorded, and the original is lost, one record, or a copy of it, may be introduced to impeach the other; and from the whole the jury may find what
the original deed was.

After proof of an original deed to himself or of his title by descent or devise,
a party may use an office copy of a deed to which he is not a party, but
which constitutes a part of his chain of title, including the first or earliest
title in the chain, as *prima facie* evidence, without showing the loss of the
original and without proof of execution or delivery.

A party wishing to prove title in a third person, not in the chain of his own or his adversary's title, cannot use a copy until the original has been sought for and proper effort made to obtain it, and then if the copy is used, it is only to prove the contents of the original after proof that such original was properly executed.

Where a copy of a deed is not used in a chain of title, it is evidence only of the contents of the paper of which it is a copy; and whatever proof of execution would be required if the original were produced should also be required in case the copy is used.

Ordinarily when a party on trial wishes to avail himself of any instrument in writing, lost by time and accident, he should *first* prove that an original instrument was duly executed, with all the formalities required by law, and *secondly*, that the instrument so executed has been lost; then only can he give evidence of its contents.

If the lost instrument was attested by witnesses, they should be called or their absence properly accounted for before other testimony can be received.

But when witnesses cannot be produced, the admissions of the opposite party of the existence of such documents, may be resorted to, and when that and all other direct evidence of the execution or former existence of such instrument is wanting, the fact may be proved by circumstances.

When a deed is shown to have been properly executed and attested, acknowledged and recorded, that is *prima facie* evidence of its delivery.

But this evidence of delivery is not conclusive and may be rebutted.

The words, *to*, *from* and *by*, when used to express boundaries, are ordinarily terms of exclusion; and are always to be understood in that way unless there is something in the connection which makes it manifest that they were used in a different sense.

Ordinarily the lines and boundaries of a town would be governed by the charter. But if there was in fact a practical location of the town under the charter with well defined and marked lines and monuments, but varying from the charter, such actual location would govern.

The fact that there was an old plan of the town made in 1806, in pursuance of an act of the legislature of 1803, had some tendency to show that a line was run and marked on the ground in accordance therewith.

That the selectmen of the town perambulated the town line in 1832, following the line as laid down on the plan, and that they claimed to those lines as being the lines of the town, would tend to show a practical location according to the plan.

Whether a party, who has called a witness and then finds that he is the agent of the opposite party for certain purposes, shall have leave to put leading questions to the witness, in the nature of a cross-examination, is a matter clearly within the discretion of the court at the trial.

The admissions of a party, made during the trial or in drawing a case, may be properly received in evidence, but are not conclusive, and if made under any misapprehensions or in ignorance of the real facts in the case, their force would be diminished or entirely overcome.

Evidence introduced, upon trial, upon a single point, may be used for any purpose, for which, during the course of the trial, it may become competent.

1. THIS is the same action in which an opinion was delivered by Bartlett, J., at the August adjourned law term, 1866. At this trial the jury disagreed, but it seemed advisable that the legal questions raised should be considered at the law term before the case went to another jury trial.

Writ of entry dated July 10, 1860, for a tract of land, " being part

of a tract of land known as Thompson & Meserve's Purchase, in the county of Coos, but not within the limits of any town, and bounded as follows : Beginning at the north-west corner of Pinkham's Grant, so called, in said county ; thence N. 8 degrees W. to the southerly line of Low & Burbank's Grant, so called, in said county ; thence south-westerly on the line of said Low & Burbank's Grant, to the northwest corner of the tract known as Jeremiah Chandler's Purchase ; then S. 1 and one-half degrees W. on the easterly line of said Pinkham's Grant ; thence northerly on the westerly line of said Pinkham's Grant to the place of beginning.    Also one other piece or parcel of land with the appurtenances, situated in said county of Coos, and being all that tract of land called and known as Thompson & Meserve's Purchase."

Plea—" And now the said Jackson Iron Manufacturing Company come and defend their rights when &c., and as to all of said demanded premises, situated in said place, called Thompson & Meserve's Purchase, and situated north of a line which commences at a large spruce tree which stands on the west line of Pinkham's Grant, and is marked on the north, south and west sides †, and from thence running north 88 degrees west, one thousand eight hundred and fifty-nine rods and eleven links, to a fir post marked S. P. ‡ 1867, with witnesses around it, said company say that they cannot render the same to the said Wells, because they say they are not, nor were they, at the time of suing forth the writ aforesaid of the said Wells, or at any time since, tenants thereof or of the freehold ; and this they are ready to verify.    Where-fore, as to all of said land and premises lying north of said line with the appurtenances, they pray judgment of the writ, and that the same may be quashed ; and as to all of said land and premises south of said line and called Sargent's Purchase, with the appurtenances, the said company say that they did not disseize the said Wells of the same in manner and form as the said Wells hath thereof in his said writ supposed ; and of this said Jackson Iron Manufacturing Company put themselves on the country.

By their attorneys, ·    FLETCHER & HEYWOOD."

" And the said plaintiff's as to that part of the said defendants' plea by them above pleaded, and whereof they put themselves upon the country, doth the like ; and as to that part and so much of said plea as disclaims a part of the demanded premises, the plaintiff accepts the same.

By his attorneys,    RAY & LADD,
H. & G. A. BINGHAM."

2.    At the November Trial Term, 1867, plaintiff pressed for a trial of this case either at the close of that term or at an adjourned term ; de-fendants alleged that they could not be ready to try the case then or at an adjourned term.    It was intimated to defendants by the court, that if they should give a bond to respond for mesne profits and should enter into an agreement similar to the one hereinafter set forth (the idea of which was suggested in part at least by plaintiff's counsel,) they might

expect a continuance to the next regular term. Accordingly, rather than try the case at an adjourned term, the defendants gave a bond to secure mesne profits, and also entered into the following agreements, filed with the clerk, Nov. 14th, 1867 :

" Coos ss.   S. J. C., November Term, 1867.   *Henry B. Wells* v. *Jackson Iron Manufacturing Company.*   It is agreed by the parties in the above action as follows, viz :   1st. The defendants agree that they will furnish the plaintiff's counsel a specification of the title, so far as when granted by the State and to whom, of any and every grant, piece or parcel of land included within the boundaries of Sargent's Purchase, as claimed by them, which the said defendants claim or ask to have deducted from the entire quantity of land within said boundaries, and of the place or places where the documentary evidence of said title or titles may be recorded, and that the said defendants exhibit to the plaintiff's counsel all documentary evidence not recorded which they intend to offer on the trial of this action.   And that all of this be done by March 1st, 1868.   2nd.   It is agreed by both parties that the execution and delivery of all deeds and copies used on either side on the former trial and referred to in the printed case be admitted, and that all objections to the captions of depositions used on the former trial are waived.

[Signed]          BENTON & RAY, H. & G. A. BINGHAM,
                                    *Attorneys for plaintiff.*
                  BURNS, FLETCHER & HEYWOOD,
                                    *Attorneys for defendants.*

1.   The chief matter in controversy was the title to the summit of Mount Washington.   Plaintiff claimed it by prior possession and as included within Thompson & Meserve's Purchase; defendants claimed that it was within Sargent's Purchase.

The plaintiff introduced the following eight items of evidence to show a paper title :

1st.   A resolution of the Senate and House of Representatives of New Hampshire, approved June 22d, 1831, (Laws 1831, page 40, ch. 51), authorizing and empowering the Governor, by and with advice and consent of the Council, to appoint a Land Commissioner, to be sworn, and to continue in office during the pleasure of the executive for the time being, whose duty it shall be to advertise and expose to sale, such pub-lic lands as he may think proper, and to sell and convey any lands belonging to the State lying south of 45 degrees north latitude, for such consideration as to such Commissioner the interests of the State may seem to require, and to execute deeds thereof; which deeds being first recorded in the office of the Secretary of State, shall be effectual for conveying all the right and title of the State to such land, saving the right of jurisdiction ; provided that all the expenses of surveying and conveying such lands shall be paid by the grantees.

2nd.   Copy of the proceedings of the Governor and Council nominat-

ing James Willey of Conway as Land Commissioner, June 27th, 1831, and appointing him July 1st, 1831.

3d.   Commission of said Willey as " Land Commissioner pursuant to a resolve of the legislature passed June 22, 1831, hereby giving and granting unto you all the power and authority given and granted by said resolve," to hold said office " during the pleasure of the executive ;" dated July 2d, 1831, with a certificate that said Willey took and subscribed the oath of office as Land Commissioner, Sept. 3, 1831.

4th.   Copy of quitclaim deed—James Willey, Land Commissioner, to Samuel W. Thompson and George P. Meserve, dated July 8, 1835 ; acknowledged August 3, 1835 ; recorded in the office of Secretary of State, Sept. 10, 1835 ; consideration, $500 ; conveying " the following tract of public land, viz :   Beginning at the northwest corner of Pinkham's Grant, thence running westerly to the south line of Shelburne Addition and the south line of Low & Burbank's Grant, to the northeast corner of Jeremiah Chandler's Grant ; thence due south on the east line of said Chandler's Grant, so far that a due east line extending to the west line of said Pinkham's Grant shall contain 12,000 acres ; thence ·northerly on said west line to the first bound."

5th.   Quitclaim deed—Samuel W. Thompson to John Bellows, dated and acknowledged May 28, 1858 ; recorded April 27, 1860 ; consideration, $20 ; conveying " the Thompson & Meserve Purchase, being the same tract of land sold and conveyed to the said Thompson and George P. Meserve, by James Willey, Land Commissioner for said State, by deed dated July 28th, 1835."

6th.   Quitclaim deed—George P. Meserve to John R. Hitchcock, dated and acknowledged May 11, 1854 ; recorded May 24, 1854 ; consideration, $500 ; premises described as in the Willey deed.

7th.   Quitclaim deed—J. R. Hitchcock to John Bellows, dated May 12 ; acknowledged May 13, 1854 ; recorded Sept. 25, 1854 ; consideration, $500 ; premises described as in Willey deed.

8th.   Quitclaim deed—John Bellows to plaintiff, dated and acknowledged July 28, 1859 ; recorded August 10, 1859 ; consideration, $800 ; premises described as in Willey deed.

The plaintiff introduced the three following items of paper title :

1st.   Copy of quitclaim deed—Samuel W. Thompson and George P. Meserve to Daniel Eastman, dated and acknowledged February 1, 1839 ; recorded May 19, 1840 ; consideration, $500 ; description :   " Beginning at the southwest corner of Daniel Elkins' land formerly owned by Joseph Hanson, thence running due west one mile ; thence northerly parallel to Pinkham's Grant about three miles to Low & Burbank's Grant ; thence westerly by said Low & Burbank's Grant to the northeast corner of Jeremiah Chandler's Grant ; thence due south on said Chandler's Grant, so far as that a due east line extending to said Pinkham's Grant shall contain 10,000 acres ; thence due east to said Grant ; thence northerly on said Grant to the first bound ; it being a part of a tract of land which we purchased of James Willey, Land Commissioner of said State, on the 28th day of July, A. D., 1835, as his deed of that date will more fully show ?"

2nd. Copy of warranty deed—Daniel Eastman to George A. Whitney and John Wetherell, dated and acknowledged May 7, 1840; recorded May 18, 1840; consideration, $500; premises described as in deed of Thompson & Meserve to said Eastman.

3d. Quitclaim deed—George A. Whitney, John G. Wetherell, Charles Faulkner and Anne S. Faulkner to plaintiff, dated December 8, 1858; acknowledged by three first grantors, December 9, 1858, by the fourth grantor, December 13, 1858; recorded December 23, 1858: consideration, $500; conveying all the grantors' title to the tract of land known as Thompson & Meserve's Purchase; "our title and interest in said premises being derived under a deed from Daniel Eastman to John Wetherell and George A. Whitney, recorded with the records of deeds of Coos county, book 31, pages 542, 543, and under a deed from Joseph C. Cady to said Wetherell & Whitney, also recorded with the recorded deeds of said county, to which reference is hereby made."

The plaintiffs introduced the following two items of tax title:

1st. Deed—Charles Bellows, Sheriff and Collector for 1846, to Joseph C. Cady, dated and acknowledged January 18, 1848; recorded April 17, 1852; consideration, $20.71; description: "The whole of one undivided half in common and undivided, in an unincorporated, unorganized place called Thompson & Meserve's Purchase, one-half of said tract having been paid on, before sale, by George P. Meserve; the said Joseph C. Cady being the legal bidder and purchaser of the residue unpaid on; being one undivided half of the whole of Thompson & Meserve's Purchase, in said county, at a public vendue legally notified and holden at the Coos Hotel, in Lancaster, in said county of Coos, on the 26th day of December, 1846, for the collection of non-resident taxes, assessed by the treasurer of said county, for the year 1844, by his warrant dated May 25, 1846, and returnable on or before the first day of January, 1847; with warranty that the said Charles Bellows had conformed to the law, and that, as sheriff and collector he had good right, as far as that right might depend upon the regularity of his own acts and proceedings, to sell and convey the same."

2nd. Quitclaim deed—Joseph C. Cady to John Bellows, dated and acknowledged January 18, 1848; recorded April 17, 1852; consideration, $20.71; premises one-half of Thompson & Meserve's Purchase in common and undivided.

Plaintiff also subsequently introduced an office copy of deed from Charles Bellows, sheriff, to George P. Meserve, dated and acknowledged June 3d, 1848; recorded June 8, 1848; conveying one-half of Thompson & Meserve's Purchase.

3. When the copy of the deed from Willey to Thompson & Meserve was offered, (it being the copy used on the former trial), defendants objected that James Willey appears to be one of the witnesses. Subsequently plaintiff proved that in 1835 there was, besides the Land Commissioner, another James Willey in Conway. The court understood that for the purpose of this trial it was not disputed, but that certain depositions introduced by plaintiff proved that John Wetherell was dead, and that John G. Wetherell & Anne S. Faulkner were his only

children. It appeared that James Willey, Land Commissioner, was a surveyor, and died in 1859.

4. Samuel W. Thompson, one of the original grantees, testified for plaintiff that after the deed to Meserve and himself, he entered on the premises described in the Willey deed, at two or more times. Against defendants' objection, plaintiff was permitted to ask him : " At the time that you entered and was in possession under your deed, what, if any, boundaries were there on the ground to which you claimed to hold, and to which you occupied?" The witness answered, the bounds Willey and he made, and described them : " The northwest and west corners, being piles of stones, making the south line come about a mile south of summit of Mount Washington."

On cross-examination he testified that these bounds were made six or eight days before the deed ; and that he meant to say that he claimed to those bounds ; that he never occupied to them any more than that he claimed the land there.

George P. Meserve, one of the original grantees, testified for plaintiff that he had had some experience in surveying ; that he had taken sights from Pinkham's Road, having a base line to operate from ; and that he had concluded, from the observations then taken, that Mount Washington would not be in Sargent's Purchase, and that it would be in Thompson & Meserve's Purchase, if it came far enough south.

5. James C. Willey, son of the Land Commissioner, testified for plaintiff, that he was with his father when he ran out the Iron Ore Tract, a piece of ungranted land near Sargent's Purchase. Subject to defendants' exception, plaintiff was permitted to put in the deed of said Tract, from James Willey, Commissioner, to Daniel Eastman, dated July 3d, 1835 ; James C. Willey testifying that he witnessed it. The same witness testified that his father was gone from home a good deal. Plaintiff asked him : " What did your father say at any time when he was leaving home, as to where he was going to survey, and what he was going to do?" The question was ruled out and plaintiff excepted. Plaintiff offered Willey's minutes of his surveys of Sargent, Chandler, and Thompson & Meserve's Purchases, but the minutes were excluded.

Samuel W. Thompson, being recalled by plaintiff, testified that he knew the land included in the boundaries of the deed, Willey to Thompson & Meserve, and that Mount Washington was in the south part of the tract ; but, upon cross-examination, it appeared that his knowledge was derived entirely from the survey made by Willey, when in his company, several days before the deed, and it did not appear that the witness, although he " helped Willey measure," assisted in any way in making calculations ; and he testified that he knew nothing of the east line of Chandler's Purchase, except what was told him ; that he did not know how far he should have to go to find the south end of his grant, to take 12,000 acres ; that he knew it would include Mount Washington, " by the way we ran it at the time."

He also testified that in the season of 1835, he helped Willey survey Hadley's Purchase, southwest of Sargent's Purchase ; and subject to defendants' exception, he was allowed to testify : " Willey was our

surveyor in that country and made plans in all that country round about there."

Plaintiff put to this witness the following questions :

1st. " State whether or not at the southwest corner of the 12,000 acres conveyed by the deed of Willey to you and Meserve, you ever made any monuments, and if so, when and where?"

2nd. " How far did the 12,000 acres, you found, extend with reference to the two piles of stones you and Willey made?"

3d. " What did Willey afterwards say as to where the southwest corner of the Thompson & Meserve land was?"

4th. " What did Willey say was included in the tract as embraced in the deed?"

5th. {After witness had testified : " I had a talk with Willey after the deed, as to the boundaries of tract described in the deed") : " What did he at that time say to you as to where the southwest corner of Thompson & Meserve's Purchase was, and what, if anything, did he say it was ?"

The above questions were all excluded and plaintiff excepted.

Plaintiff introduced the testimony of several witnesses tending to show possession of Mount Washington, especially the site of the Tip-Top House, by John Bellows, at some time between 1851, and 1854.

6. Samuel F. Spaulding testified that in 1853 he with others built, under leave from John Bellows, the Tip-Top House ; and that afterwards he went into partnership with Hall and others, owners of Summit House. Upon cross-examination, defendants asked him : " Don't you know that Hall arranged with Pingree to go in under the Jackson Iron Manufacturing Company?" Plaintiff objected to question (it is believed on the ground that the arrangement was in writing.) Witness answered : " Hall asked if I would sign a lease ; I utterly refused ; I did not know of arrangement till two years after, when Pingree presented lease, claiming $60 a year rent." There was some testimony tending to show that John Bellows, under a claim to the mountain, built, or helped build, a pony road to the Glen House to or towards the summit.

7. Against defendants' objection, Samuel W. Thompson was permitted to testify that in 1851 the lower end of this road, near the Glen House (not on the land in controversy), was on one occasion barred by pole and chains, and no one allowed to pass till they got Bellows' permission.

8. Plaintiff having rested, defendants moved for a nonsuit, on the ground that there was no legitimate evidence to show that the summit of Mount Washington was in Thompson & Meserve's Purchase. During the discussion of this motion, defendants' counsel, in reply to a question from the court, admitted that the tract described in their plea included the summit of Mount Washington.

The motion for a nonsuit was overruled, and defendants excepted.

9. Defendants introduced the following items of paper title, (plaintiff objecting to first deed for immateriality, that it was not in defendants' chain of title) :

1. 1st. Copy of quitclaim deed—James Willey, Land Commissioner,

to Jacob Sargent *et al.*, dated and ackowledged May 31, 1832 ; recorded in the office of Secretary of State, June 5, 1832 ; consideration, $300 ; conveying "a certain tract of public land in said State, and county of Coos, and described as follows, viz : Beginning on the northeast corner of a lot of land given to widow Dorcas Eastman of said Bartlett by the Legislature of New Hampshire ; thence running due west three and one fourth miles ; thence due north so far as that a due east course, extending to the west line of the town of Jackson or Pinkham's Grant, shall contain 25,000 acres ; thence southerly on said westerly line of Jackson to the southwesterly corner thereof; thence south so far as that a due west course shall strike the first mentioned bounds ; excepting 150 acres which I have sold Otis Eastman, belonging in said described premises, as his deed will more fully show ; and if any of the above described premises have heretofore been granted by authority of said State, they are to be reserved out of the same, and as many acres annexed on the northerly end of the above described tract adjoining Pinkham's Grant."

2nd.  Deed—George P. Meserve, sheriff, to Jared W. Williams, dated and acknowledged January 18, 1844 ; recorded February 7, 1844 : " Know all men by these presents, that I, George P. Meserve of Jackson, in the county of Coos and State of New Hampshire, sheriff of said county of Coos, and collector of taxes for the year 1841, on unincorporated places in said county, having so few inhabitants as to be incapable of choosing town officers, do, by the virtue of the authority in me vested by the laws of this State, and in consideration of twenty-one dollars and twenty-eight cents, to me in hand paid before the delivery hereof, by Jared Williams of Lancaster, in the county of Coos and State of New Hampshire, hereby sell and convey to him the said Jared W. Williams, his heirs and assigns, the whole of the unincorporated and unorganized place called Sargent's Purchase in said county of Coos, except lot number 6 in the third range, the west half of the same, lot number 22 in the second range, the undivided half of the following lots numbers 10 and 18 in the first range, numbers 12 and 18 in range two, and numbers 1, 13 and 19 in third range, and 12 in 4th range, and numbers 6 and 12 in fifth, redeemed, and lots numbered 20 in second range, 18 in fourth range, 18 in fifth range, paid before the sale ; the said Jared W. Williams being the legal bidder and purchaser of the same at public auction, legally notified and holden at the Coos Hotel, in Lancaster in said county of Coos, on the 10th day of January A. D., 1843, for the collection of non-resident State taxes assessed by the Treasurer of the State for the year A. D., 1841 ; to have and to hold the said premises with the appurtenances, to him the said Jared W. Williams, his heirs and assigns forever ; and I, the said George P. Meserve, do hereby covenant with the said Jared W. Williams, that, in making sale of the same in my said capacity, I have in all things conformed to the directions and requisitions of the law in that behalf provided ; and that as sheriff and collector aforesaid, I have good right, as far as that may depend upon the regularity of my own acts and proceedings, to sell and convey the same in manner aforesaid."

3rd.  Quitclaim deed—Jared W. Williams to George M. Herring,

dated, acknowledged and recorded July 27, 1844; consideration, $150; same description as in last deed.

4th. Quitclaim deed—George M. Herring to George P. Meserve, dated and acknowled April 9, 1846; recorded May 5, 1846; consideration, $100; same description as in last deed, "and the west half of said lot number 6 in the third range of lots in addition."

5th. Quitclaim deed—George P. Meserve to Samuel E. Coues and David Pingree, dated and acknowledged Sept. 1846; recorded September 21, 1846; consideration, $140,26; same description as in last deed.

6th. Quitclaim deed—Samuel E. Coues and David Pingree to defendants; dated and acknowledged by Coues, November 18, 1853, acknowledged by Pingree, October 25, 1855; recorded, October 27, 1855; consideration, $1,000; being land conveyed by the last deed.

Defendants then introduced the following evidence to sustain his tax title:

1st. An act of the Legislature, Laws, November session, 1840, ch. DLXXX, p. 501, approved December 23, 1840, to raise by taxation $60,000, and directing the Treasurer to issue his warrants, etc.

2nd. The court was satisfied by testimony of Pinkham, that all the records, books and papers relating to tax titles which were in the office of the clerk of the courts of Coos county, January 1848, were burned, and that none of said papers returned to said office before 1848 are now in said office.

3rd. Copies of the *N. H. Patriot* of October 13, 20, and 27, 1842, containing the following notice:

"State of New Hampshire—Coos, ss. Public notice is hereby given to the proprietors and owners of land in the following Townships, Locations and Grants, in the County of Coos, that so much of said Townships, Locations and Grants will be sold at public vendue at the Coos Hotel in Lancaster, in said county, on Tuesday, the 10th day of January next, at ten o'clock in the forenoon, as will satisfy the several warrants issued against said Townships, Locations and Grants, by the Treasurer of said State, for the following State taxes raised by an act of the Legislature of this State, passed December 23d, 1840, and entitled "An act to raise sixty thousand dollars for the use of the State, to be assessed, collected and paid into the Treasury on or before the first day of December, A. D., 1841" and incidental charges, unless prevented by previous payment, to wit:

|  | Tax. | Warrants. | Total. |
|---|---|---|---|
| Bean's Purchase | 2.40 | 1.00 | 3.40 |
| Crawford's Purchase | .60 | 1.00 | 1.60 |
| Chandler's Purchase | .60 | 1.00 | 1.60 |
| Dixville over ¾ paid | 7.80 | 1.00 | 8.80 |
| Sargent's Purchase | 1.20 | 1.00 | 2.20 |
| Success, 22 cents paid by S. Hall of Portsmouth, | 12.60 | 1.00 | 13.60 |

GEORGE P. MESERVE, Sheriff.

Jackson, September 17, 1842.

4th.   Copies of *Coos County Democrat*, of October 4, 11, 1842, containing the same notice, and secondary evidence of the contents of the advertisement in the *Coos County Democrat* of October 18, 1842.

It appeared that prior to 1841, a portion of Sargent's Purchase had been annexed to Jackson, and another portion to Bartlett.   George P. Meserve, sheriff of Coos county from 1839 to 1844, testified for defendants at length as to particulars of tax sale, &c.   Only those parts of his testimony are given on which plaintiff founded exceptions to the validity of the tax title.

The deed to Williams being shown, the witness said : " Williams bid off all described in that deed.   As to the offer, I stated the tax and costs, and asked who would pay tax and costs for the least number of acres ; no other one bidding, I struck it off to him."   Plaintiff's examination : " We made calculations of number of acres to get tax.   Had a plan of the Grant.   If a man came to pay, would estimate amount of tax on his lot, take it, deduct it, and sell for balance ; we would take tax and amount of ,costs ; find out number of acres in lot ; in estimating whole lot we deducted part annexed to Jackson, I think.   Did not receive pay on land in Jackson after sale.   Southeast portion of Sargent's Purchase is in Bartlett ; think lots commence at south end, if so I suppose Lot No. 1, third range is in Bartlett.   If No. 1 was redeemed, it must have been sold.   If that is the case, I must have sold the whole of Sargent's Purchase ; I undertook to deed according to my sale.   Cannot tell now, amount paid before or after sale on any of these lots ; we endeavored to apportion tax and costs as near as we could. Think about 4,000 acres of Sargent's Purchase in Jackson ; do not know how many in Bartlett ; never knew ; never made any estimate of it ; I probably sold the whole tract as bounded in the deed, that is, I do not now remember what I did sell.   I had plan of Sargent's Purchase, purporting to be copy of Willey's plan, and I used this plan. In the sale I made no reservation of any lots or grants said to come within the boundaries of that plan ; Deputy Secretary returned same copy I sent ; certified that nothing had been paid."

Defendants' examination resumed,—" Warrant from Treasurer directed me to collect a tax on Sargent's Purchase ; said nothing about number of acres, or the part in Jackson.   At sale, January 10th, 1843, I do not remember saying anything about the number of acres or the part in Jackson ; I put up Sargent's Purchase. "   Afterwards the witness being recalled by the defendants produced the plan he had at the sale, and testified as follows : " When I gave my deed to Williams I had this plan ; I suppose I was guided by this copy, in making conveyances to Williams, in certain particulars ; as to one of the excepted lots, I was guided by the plan ; should think probable I was, as to the other lots.   So far as lots and ranges are concerned and named, I was guided by this copy ; I used this copy in receiving payment of taxes ; it was all the guide I had.

Plaintiff's examination ; " Lot 2, in range 2, according to the plan, would be in Bartlett or Jackson ; so would, I suppose, lot no. 1 in 3d range ; lot 10 in 1st range would probably come in Jackson ; lot 6 in

3d range would, I think, fall in Sargent's Purchase. I offered Sargent's Purchase, as named in the warrant; plan lay on the table as I was making sale; can't tell what I expected.     In stating exceptions, I referred to the plan produced, or to a similar one."

Before the witness had been recalled to give the above testimony, in connection with the production of the plan, plaintiff had raised the following objections to defendants' tax title, viz:

10.  1st.  It appears from the testimony of the defence, that the whole of Sargent's Purchase including that part of said Purchase in Jackson and Bartlett was sold, when only the part not so included was liable to be sold.

(Plaintiff takes the ground for that reason the sale was void *in toto*.)

2nd.  The list was of Sargent's Purchase, that is, of the unorganized part, and the sale was of Sargent's Purchase, and of a part of Jackson and of a part of Bartlett; and the payment and the redemption of the tax, so far as the same was paid and redeemed, was of Sargent's Purchase, and a part of Bartlett and Jackson.

(Plaintiff claims that sale and all other proceedings must be in accordance with list.)

3d.  The lots that paid and the lots redeemed only paid their proportion in reference to Sargent's Purchase and a part of Bartlett, and a part of Jackson; hence, if only the unorganized portion of Jackson's Purchase, on which the taxes were not paid, was sold for the balance *of tax not paid, it was sold for too much*, and the sale was void for that reason.

4th.  It does not appear, and it should appear, what amount was paid before the sale, who paid it, and on what quantity of land it was paid, and what the amount of tax unpaid was at the time of sale, and the amount of costs; also what lots were seasonably redeemed; by whom, and what was paid for that purpose; and how much of the tax and costs then remained unpaid; and how that sum compared with the sum the lots sold and not redeemed ought to have paid.

5th.  It appears from the deed, that on certain lots the tax was paid before sale, and that certain lots were seasonably redeemed, and excepted in the deed, but it does not appear where those lots lie, nor that they are not the very land in controversy.

6th.  No allotment has been shown, although lots, the size and location of which do not appear, are excepted in the deed; hence no force or effect can be given to what has been shown by reason of its uncertainty.

7th.  The copy of warrant sent the deputy secretary was sent back to the sheriff, instead of a copy of that copy, as required by law. Thus a paper belonging in the deputy secretary's office was taken therefrom, and used for a purpose for which a copy should have been used.

8th.  The deed of Meserve, as collector, is void for uncertainty; it not appearing in any way, what part of Sargent's Purchase is thereby conveyed, and what is excepted.

The court having intimated that the objection, grounded on want of evidence as to locality, was a serious one, the defendants recalled Me-

serve, who testified as above stated, and produced the plans he had; the defendants also offered a plan, substantially similar to the copies produced by Meserve; and defendants offered evidence tending to show that their last plan was the original plan of Sargent's Purchase made by Willey.

11.  The defendants offered all these plans "as pieces of evidence, tending to show an allotment." The court *pro forma* admitted them, and plaintiff excepted.

Subsequently plaintiff called Samuel Alexander, who testified that he was one of the original grantees of Sargent's Purchase; that in August or September, 1832, he got Willey to go and survey some of that land, and make out a plan; left it to him how much to survey; he was to do enough to make out a plan so that this land could be divided among the proprietors; that he, (Alexander) was acting for himself, and for the other owners of the land; that he afterwards (he thought rather late in same fall) received a plan from Willey; that, after the proprietors had marked out the lots on the plan to each other, they quit-claimed to each other, December 22, 1832; that the plan produced by defendants was not the original Willey plan, but he should think it was a true copy; that he paid Willey ten dollars for making survey and plan.  The witness was afterwards recalled and testified as follows:  "I went to Willey to get him to survey that tract, or a part of it, so that he could make out a plan so that the proprietors could make a division of it.  I told him then to go and survey out a part of it into lots and make the bounds, and make the plan of it; so that we could use it to divide among proprietors.  He said he would do it.  I did not limit him to anything further than this; I wanted him to go on and do it right; thought he understood it better than I did.  When the plan was returned to me it was accepted."  On cross-examination the witness testified: "I told him to survey enough of Sargent's Purchase (and make the bounds), to make a plan for us."  The court, before Alexander testified, *pro forma*, overruled the objections to the tax title, and the plaintiff excepted.

12.  Defendants called the Deputy Secretary of State, who produced the original record, of which plaintiff had introduced a copy of the deed from Willey to Thompson & Meserve.  Plaintiff, under the foregoing agreement, objected to the introduction of the original record, and also on the ground that a copy could not be impeached by another copy, but it was admitted, subject to plaintiff's exception.  The original record contains no evidence of there having been a seal on the deed, and reads "to the southeast corner of Jeremiah Chandler's Grant."

As it appeared by plaintiff's plan, that the south line of Low & Burbank's Grant would not come near the southeast corner of Chandler's Purchase, but would strike the northeast corner; the court now suggest the question, whether (supposing the localities correctly laid down on plaintiff's plan), the words, "*the southeast corner of*", must be rejected, and also, whether the deed, though not under seal, would not give color of title.  (As the court finally ruled, that plaintiff had not shown what was included within the description, as claimed by plain-

tiff, no rulings were made upon the above points.)   Subsequently plaintiff was allowed subject to defendants' exception, to put in evidence Coos Records, vol. 31, p. 560, being the record made May 23, 1840, of the same deed, conforming exactly to the copy first introduced by plaintiff from the record in Deputy Secretary's office.   It appeared in the course of the trial, that the original deed was lost or mislaid, and in the opinion of the court there was sufficient foundation for the introduction of secondary evidence.

13.   Defendants were permitted, subject to plaintiff's exception, to introduce act of 1786, appointing Bucknam, McMillan and another to sell certain State lands.

14.   Defendants then offered an office copy of a deed, dated November 30, 1796, from Bucknam and others to William K. Atkinson, conveying lots 24, 38, &c., southwest of Rogers, Wentworth and Treadwell's Locations ; which lots defendants claimed were within the bounds named in the deed to Sargent and others in 1832.   Defendants offered an affidavit which satisfied the court that proper but unavailing search had been made for the original, among the papers of the late William K. Atkinson.   Plaintiff objected that defendants could not be permitted to show that any part of Sargent's Purchase had been previously granted, but the objection was overruled.   Plaintiff then objected that there was no evidence of execution or delivery of the deed to Atkinson.   The office copy was excluded and defendants excepted.   Defendants then offered an office copy of a deed, dated December 15, 1796, from William K. Atkinson to John McMillan, conveying lot 38, adjoining R. W.&T. Locations.   Plaintiff objected, because not notified of this evidence under the agreement ; because it has no tendency to prove a grant from the State to Atkinson, and hence is immaterial ; and because no foundation has been laid for the introduction of secondary evidence.

The office copy was excluded subject to defendants' exception.   Subsequently defendants proposed to offer some evidence tending to show an allotment made some time later than these deeds, in conformity with the Atkinson deed and other deeds, and a plan from the papers of McMillan, (now deceased), but offered no evidence of possession or occupancy other than that the lots are marked on the ground, there being no evidence by whom they were so marked, or by whom the allotment was made ; and the defendants then proposed to again offer the above office copies ; but the court ruled the foregoing evidence inadmissible, and defendants excepted.

15.   The position of the westerly line of Jackson at the date of the grant to Sargent and others was a matter in dispute.   Defendants were allowed, subject to plaintiff's exception, to put in the act of December 4, 1800, incorporating Adams (now Jackson).   Plaintiff objected because not notified under agreement.

Defendants introduced a copy of a map of Adams, purporting to have been made in 1806, filed in the office of the Deputy Secretary of State, which gave, as the west line of Adams, courses and distances very different from the west line of Rogers, Wentworth and Treadwell's

Locations, which plaintiff claimed to be the west line of Adams, and which was admitted to be a known marked line, run about 1771.

16.  The act of 1800 incorporated a town " by the name of Adams, including the lands commonly called Fowler's, Gilman's, Gridley's, Rogers' and Wentworth's Locations, in said county, with certain State lands, butted, bounded and described as follows, viz : Beginning at the most northerly corner bound of a tract of land granted to Wentworth and Rogers ; from thence runs south eighty-one degrees east, seven miles, to the northwesterly corner bound of Chatham ; thence south six and a half degrees west, seven miles and one hundred and thirty-four rods, by Chatham to the southwest line of Fowler's Location ; thence by State land, McWilliams', Stark's, Gray's and State lands to the bound begun at, containing (exclusive of said Locations) thirteen thousand eight hundred and ninety-three and three-quarters acres of land." The court ruled that according to the charter, the west line of Jackson would not run through State land, but would be the line between the State land on the west and Rogers, Wentworth and Treadwell's Locations on the east ; that is to say, that running from Gray's (on the south) to the bound begun at, the line would go east of all the State land in that section ; this in effect would make the west line of the R. W. & T. Locations the west line of Jackson.  To this defendants excepted.

17.  The court also ruled, subject to defendants' exception, that if the west line of Jackson on the plan of 1806, varied from the charter, the charter would govern unless it appeared that, by the original survey of Adams, between 1800 and 1806, or about the date of the plan in 1806, or soon after, a line, varying from the charter, was run and marked on the ground by monuments.

18.  The court also ruled, subject to defendants' exception, that the old plan had no legal tendency to show that a line was run and marked on the ground by monuments in accordance therewith.

19.  Defendants offered to show that in 1825, two of the selectmen of Jackson, run and marked a line west and south of Rogers', Wentworth's and Treadwell's, and varying both from the charter (as construed by the court), and from the plan of 1806.  The evidence was excluded, and defendants excepted.  George P. Meserve testified that in 1832 he was one of the selectmen of Jackson ; that, on April 10th, 1832, he with Trickey, also a selectman, run a portion of the south and west lines of Jackson, in accordance with a plan found among the town records, which was substantially a copy of the plan of 1806.  Subject to plaintiff's exceptions, defendants were permitted to ask Meserve : " What was your purpose in running this line ?"  Answer—" To run it for a town line."  Question—" And in marking beech tree ?"  Answer—" To make it the southwest corner of Jackson."  Meserve also subsequently testified, subject to plaintiff's exception : " In 1832 our object was to run the town line by the old plan, and we claimed to this line."

Subject to plaintiff's exception, John Rogers testified that he was one of the selectmen of Jackson in 1832 ; that the board of selectmen

agreed to go and run the line; that Meserve and Trickey went; that after they had run the line, he (Rogers) said it was all right; that before it was done he said it ought to be done; that they all agreed to do it; and that from April 10th to May 31st, 1832, he claimed the line thus run, as the line of Jackson.

It appeared that the reason for running portions of the south and west lines in 1832, was to ascertain whether certain persons, living south of R. W.& T. Locations, belonged in Jackson or not. Defendants offered to show that persons, living south of the south line of Jackson as it is claimed by some to be, but north of the south line of Jackson, as it would be by the plan of 1806, voted, and paid taxes in Jackson in 1832, and for several years immediately prior thereto. This evidence was excluded and defendants excepted.

20. Defendants offered to show that between 1824 and 1828, Daniel Pinkham, under the resolution in his favor, hereinafter referred to, went on to land westerly of Rogers, Wentworth and Treadwell's Locations, and made an examination of the land between that line and the line he supposed to be the west line of Jackson, to ascertain the value of the land, and how valuable it would be in reference to paying him for building the road which he afterwards constructed. This was offered in order to show where the west line of Jackson was at the date of Sargent's Grant; said Pinkham then being a resident of said town, but now deceased. The evidence was excluded, and defendants excepted.

21. Subject to defendants' exception, plaintiff was permitted to ask James W. Weeks, called by defendants as an expert in surveying, and who had made two of the plans used by defendants: "What, in your opinion, does that westerly line on the plan of 1806 indicate with reference to the west line of Rogers, Wentworth and Treadwell's Locations?" Answer—"Without any other information but that plan, I should think that it indicated the west line of Rogers, Wentworth and Treadwell's Locations."

22. Samuel Johnson, one of defendants' witnesses, who had assisted Barker in surveying Sargent's Purchase, testified on cross-examination that, in their calculations they had treated the west line of R. W. & T. Locations as the line of Jackson. Subject to defendants' exception, plaintiff was allowed to ask him: "Did Barker tell you this west line of R. W. & T. Locations was also the east line of Sargent's Purchase?"

8. Defendants offered a resolution of the Legislature, approved June 16, 1824, providing land should be granted to Daniel Pinkham, on condition that he built a road; the land to extend one half mile from the road on each side, from Adams, now Jackson, to Durand, now Randolph. Plaintiff objected that this was not the grant referred to in the subsequent conveyances, but it was admitted subject to plaintiff's exception. Defendants also put in resolution of July 4, 1834, directing treasurer to convey same lands to Pinkham.

23. Defendants offered resolution, approved July 4, 1826, authorizing State Treasurer to convey to Dorcas Merrill a tract of land, beginning at an ash tree on the north of Rocky Branch so called, by la··'

granted to Sylvanus Emery; thence S. 82 degrees E., 100 rods; thence W. 8 degrees E., 160 rods; thence N. 82 degrees W., 100 rods; thence S. 8 degrees W., 160 rods, to the bound begun at, containing 1000 acres. This was admitted, subject to plaintiff's exception. George P. Meserve testified: "I knew Dorcas Merrill; she was a half sister to my wife; her mother's name was Dorcas Eastman; never knew any other Dorcas Eastman, living in the vicinity of the land, at or after the date of the grant." No deed from the State authorities to Dorcas Merrill was shown. The testimony hereinafter quoted from Noah Barker's deposition was the only testimony introduced by defendants, showing the situation of the Dorcas Merrill lot as granted in the resolution. There was no evidence that Dorcas Merrill ever occupied any other lot in the vicinity of Sargent's Purchase, than the one which plaintiff claimed to be the Merrill lot as located. Defendants contended that the starting point from which to run out Sargent's Purchase is the northeast corner of the Dorcas Merrill lot as granted. Plaintiff contended that the Dorcas Merrill lot had been located prior to May 31st, 1832, by bounds essentially varying from those described in the grant, and that a certain maple tree at the northwest corner of the Merrill lot, as located, was the starting point, because Sargent's Purchase, as plaintiff claimed, had been located as starting from this point, and defendants' prior owners had recognized this as the starting point.

Samuel W. Thompson testified that when Willey and he began the preliminary survey of Thompson & Meserve's Purchase, Willey showed him the maple, and said it was the corner of Sargent's Purchase. Defendants offered the deposition of Noah Barker, who had made several surveys of Sargent's Purchase for defendants.

It appeared (Int. 68) that before making any surveys in Aug. 1853, Barker called on Willey. Int. 69 by plaintiff: "What led you to go and see Willey at that time?" Answer—"By advice of Gen. Meserve, on whom I was directed to call, by my employers, for information relative to the surveys to be made."

From 1846 to the present time, Meserve acted as agent for defendants and their grantors, to look after lands, pay taxes, and see to trespassers.

24. The following interrogatories by plaintiff to Barker were read, subject to defendants' exception:

Int. 51. "Did George P. Meserve tell you that the maple tree corner was the southeast corner of Sargent's Purchase, and so point it out to you on the ground? Ans. "He or Emery said they so understood it."

Int. 56. "Did he (William Pickering, who lived in 1853 on Merrill lot as said to be located), also point out or say that this maple tree corner was the corner of his or the Merrill lot, and the southeast corner of Sargent's Purchase?" Ans. "I am not certain that he went with us, but think he did; and if he did, I have no doubt he pointed that out as the corner of his lot; I don't remember whether he said it was the southeast corner of Sargent's Purchase or not.

Int. 73, by plaintiff, was : " Did Willey tell you that the maple tree was the corner of Merrill lot?"   Ans.  " I am not certain whether he did or not."

Int. 74, by plaintiff: " What do you think about it? What is your impression, and how did you testify on that point at Lancaster?" Ans. " I should infer from my present impression that he may have told me that tree was the corner of the Merrill lot, and that I so testified at Lancaster."

Int. 76, by plaintiff: " Did not Meserve tell you that he knew where the maple tree corner was, and that he had been to it before that time?"   Ans.   " I think he did."

Barker testified that the same parties who employed him in 1853 to survey Sargent's Purchase, also employed him to survey the Iron Ore Tract, and that he thought he had a description of that tract from which to make a survey of it.

Int. 80, by plaintiff: " From whom did you get the description which you have, and will you give it to us, or the words of it?"   (Defendants' attorney objects to that part of the interrogatory which calls for the description.)   Ans.   " I penned it down from the reading of it by Mr. Willey, from his notebook or minutes, and it is as follows : " Beginning at the southwest corner of Gridley's Location ; thence north 83 degrees west, about 420 rods to Sargent's Grant ; thence southerly by the east line of said Grant three hundred and twenty-two rods to the northwest corner of widow Dorcas Eastman's Grant ; thence southeasterly by the northerly line of said Dorcas Eastman, John Emery, and Sylvanus Emery's Grant, to Bartlett old line ; thence northerly on said old line to the first bound. I worked and surveyed as before stated, on this tract from these minutes."

Int. 83, by plaintiff: " At what point on the tract (the Iron Ore Tract) did you first begin to run, and how far, and what direction did you run?"   The answer, which was lengthy, detailed the course of the survey.

Int. 98, by plaintiff: " Do not the boundaries of the Iron Ore Tract, as you obtained them from Willey and traced them on the land, so far as you found them there, recognize the existence of the Dorcas Merrill lot as located, and not as you say it was granted?"   Ans.   " I think they do, as the Merrill lot was to be located."

Int. 99, by plaintiff, was excluded, but the answer to it was admitted as follows : " So far as the Iron Ore Tract is concerned, I think that the line running southerly from the spruce tree corner does recognize the maple at the southwest corner of the Iron Ore Tract, according to the minutes I received from Willey."

Int. 100, by plaintiff, was excluded, subject to plaintiff's exception :

Int. 100.   " Does it not also recognize the maple tree as the southeast corner of Sargent's Purchase in recognizing it as the southwest corner of the Iron Ore Tract?"

25.   Gilbert Emery testified for plaintiff : " Helped Willey survey Sargent's Purchase ; made corner on widow Dorcas Merrill's lot ; a rock maple ; set compass north ; worked one day ; ran westerly ; I car-

ried chain; Willey said he was to accomplish some land in another place; got to make it out there 25,000 acres; said he could run it far enough to make his plan; all he reserved out was the Eastman tract, (Otis Eastman lot): " We ran on to mountain; Willey said he intended that line to be the permanent line of Sargent's Purchase."

George P. Meserve, in answer to a question not now remembered, testified: " Showed Barker maple tree, because Willey told me the maple was the corner of Sargent's Purchase."

This testimony was excluded, subject to plaintiff's exception. The following question by plaintiff to Meserve was excluded, subject to exception: " Did you not state to different persons, while in the exercise of your agency of looking after Sargent's Purchase for defendants, that the maple tree corner was the corner of Sargent's Purchase?"

Subject to defendants' exception, Meserve testified as follows: " Willey told Barker that the maple and ash tree was the southeast corner of Sargent's Purchase, and that he could find it by the side of Rocky Branch. Don't remember that he said who made that corner; he said he fixed that as the corner of Sargent's Purchase; Willey said he ran from that corner; told what course,—west, I think,—nearly two miles; used compass meridian. Till Barker was there in 1853, I considered maple tree the southeast corner; knew of no other. While I was owner of the Iron Ore Tract, I recognized maple tree corner as one of the corners of the Dorcas Merrill lot as located, and it was said to be one of the corners of my tract; never knew any other corner till after I was there with Barker."

Meserve, against defendants' objection, was allowed to testify that he, in August 1853, pointed out the maple or ash tree to Pingree as the corner of the Iron Ore Tract, and said to be the corner of Sargent's Purchase.

Plaintiff contends that the State owned all the land adjoining the Dorcas Merrill lot, as occupied, until the deed to Sargent and another, and that, till subsequent deeds from the State, recognized the maple as the corner of the Merrill lot and of Sargent's Purchase. The deed of Hadley's Purchase may be considered in connection with this case, the same as if it had been offered at the trial. Plaintiff offered a deed (which may be referred to) from Land Commissioner to Dolly Emery, dated June 18, 1835, and to show in connection therewith that in 1835 no controversy had arisen, and that all parties supposed the corner of the Dorcas Merrill lot, as located, to be the corner of Sargent's Purchase. On one of the copies of the Willey plan of Sargent's Purchase, produced by Meserve, there was a pencil sketch of the Dorcas Merrill lot. Meserve testified: " Can't tell whether D. M. pencilling was put on before sale; no recollection of putting it on after sale nor before."

Plaintiff claimed that the plan was evidence to show by this pencilling, &c., the location of the Dorcas Merrill lot. The court ruled otherwise, and plaintiff excepted.

Plaintiff offered to show the title to the Iron Ore Tract, from Daniel Eastman to these defendants, for the purpose of showing recognition

and assent on the part of the owners of the Iron Ore Tract, to the maple tree as the southeast corner of Sargent's Purchase.

James C. Willey, subject to defendants' exception, was permitted to testify that his father said the maple tree was the corner of the Dorcas Merrill lot. The time when this was said was somewhat uncertain. The court ruled that if it was said after the deed to Sargent, it was incompetent.

Plaintiff claimed that, if the old Willey plan showed that the maple tree corner was the southeast corner of Sargent's Purchase, and the plan or a copy was used by the sheriff in selling the tract, and the southeast corner was in fact located there, then defendants, claiming under tax sale, are bound by the plan and description of the territory as given by Meserve at the sale.

Plaintiff offered to show that a subsequent grantee of lots 1 and 2 inquired for the corner of Sargent's Purchase, and that the maple tree corner was pointed out to him.

Gilbert Emery testified: " When Willey went on with me to run out Sargent's Purchase, he called the maple tree the corner of Widow Merrill's."

26. The court ruled, subject to plaintiff's exception, that there was no evidence upon which the jury could find that the northwest corner of the Dorcas Merrill lot was the starting point from which to run out Sargent's Purchase, instead of the northeast corner named in the deed to Sargent. Subsequently the court ruled, subject to the plaintiff's exception, that evidence that Willey, while on the spot, and while Land Commissioner and engaged in measuring out adjoining tracts in service of State, (said tracts being bounded on same maple tree corner), declared that a particular bound which he pointed out was a bound of Sargent's Purchase, would be incompetent. The court also reversed the ruling, admitting Willey's declaration to Barker as to the bounds of Sargent's Purchase.

Subject to defendants' exception, Samuel W. Thompson was allowed to testify that Willey pointed out a certain spot as the northeast corner of Chandler's Purchase, and that while going south from that spot, Willey said they were on line of Chandler's Grant. These declarations were made a few days before the conveyance to Thompson & Meserve.

The deed from Willey, Land Commissioner, to Chandler, dated July 9, 1835, was put in by plaintiff. The description is as follows: " Beginning on the southwest corner of Cutts' Grant on Hart's Location ; thence northwesterly on said Grant to the northwest corner thereof ; thence westerly and northerly on the west line of Sargent's Grant, on to the northwest corner thereof; thence due north to Low & Burbank's Grant ; thence westerly by said Low & Burbank's Grant, to the northeast corner of Ethan A. Crawford's Grant ; thence south by said Grant and Bean's Grant to Hart's Location ; thence southerly by said Location to the first bound, containing ten thousand acres more or less."

8. Joseph Pitman, jr., testified for plaintiff that he had assisted in running a line from the northeast corner of Chandler's Purchase, south one and one half degrees west on the east line of Chandler's Purchase,

800 rods; that a line, run from thence south eighty-eight and one half degrees east to the west line of Pinkham's Grant, would run about 111 rods south of the Tip-Top House.   Upon being questioned as to his means of knowing where the east line and northeast corner of Chandler's Purchase were, he testified that he had assisted in a survey to ascertain the west line of Sargent's Purchase, (taking the maple tree for the starting point), and that the east line of Chandler's described by him coincided with the west line of Sargent's Purchase thus ascertained.   (Pitman described a different northeast corner from that described by Thompson.)

There being testimony as to the result of surveys of Sargent's Purchase, made from different starting points, the jury were instructed, in substance, that, after ascertaining the true northwest corner of Sargent's Purchase, they could then, from Pitman's testimony and the Chandler deed, ascertain where the southwesterly corner of the tract, described in the first count would be, and how far south of the Tip-Top House the southerly line of the tract, so described, would come.

4.   Samuel W. Thompson, recalled by plaintiff, testified, subject to defendants' exception, as follows:   " Purpose in the Willey survey was to ascertain amount of ungranted land in the vicinity of the mountains south of Low & Burbank's Grant, north of Conway, between the Notch road, and the Pinkham road.   Willey prepared plans of Conway, and all locations and pieces of granted lands, as far as he knew. Willey made observations, took bearing of objects on mountain from base line in North Conway before starting.   We carried compass and chain; went to maple tree; Willey said that was the corner of Sargent's Grant.   We run out south line of Sargent's Grant; turned corner; went out to Location; after getting out above Crawford's, took observations on Mount Washington; next observation taken at Fabyan's; spent the night at Fabyan's; Willey had plan indicating distance over which we had passed.   We came back to Jackson; went on to Pinkham road; took observations below Rogers place; next observation at Mineral Springs above Glen Ellis' Fall.   Willey knew distances on this road by measure of Grant and Turnpike; took observations on Peabody River, 100 rods below Glen House; went to Gorham line, Shelburne Addition, Low & Burbank's; Willey used compass; we found line till we got out of the growth; when we got on to mountain, we took observation on Mount Washington.   Willey took observation at northeast corner of Chandler's Purchase; can't say he made any computations at that corner; then due south, on what Willey said was the Chandler line, to the second pile of stones; Willey took observation there; he erected that as a bound of 12,000 acres; Willey said we had gone far enough to make 12,000 acres; this was after making his observations and erecting monuments; thence due east to Tuckerman's Ravine; took observation; came out on Pinkham's Grant, near Cascade; made monument—a beech tree."   In answer to a question by the court, witness said: " I took no observations and made no calculations during this survey."

It was not claimed that witness was a surveyor.   Plaintiff asked

witness: " According to this survey you assisted Willey in making, taking Shelburne Addition and Low & Burbank's Grant for the north bound, and Pinkham's Grant for the east, how far would the 12,000 acres extend?"

The question was ruled incompetent, subject to plaintiff's exception, and the jury were instructed to disregard the above testimony of Thomson.·

8. The court ruled, subject to plaintiff's exception, that no competent evidence had been produced upon which the jury could ascertain the location or bounds of Thompson & Meserve's Purchase, and that the plaintiff could not recover under the paper title from the State, nor upon the second count in his writ, there being no evidence as to what premises were included in the Thompson & Meserve Purchase. But the court, feeling bound by the previous decision in this case, ruled, subject to defendants' exception, that " the deed from John Bellows to the plaintiff would give the latter such seisin as would enable him to maintain this action (" for such portion of the premises as John Bellows had had possession of), " against one who showed no evidence of title." Remarks were also made by the court which might have led the jury to infer that plaintiff could also avail himself of the actual possession of the holders of the paper title prior to John Bellows.

7. Subject to defendants' exception, John J. Davis testified : " In 1851, I worked for John Bellows on Mount Washington horse road on Glen side, six, seven or eight weeks ; I had charge of work given me by Bellows, and Bellows gave me money to pay the men. Bellows claimed to own mountain and top, and paid for building one part of the road."

2. In the course of the trial, defendants moved to be relieved from the agreement of November term, 1867, alleging that it operated hardly or unjustly upon them. The motion was denied with an express reservation for the law term of all matters within the discretion ·of the court at the trial term.

27. It appeared that Noah Barker had made several surveys on or near Sargent's Purchase, between 1853 and 1867; and that he had acted as a Commissioner for the State of Maine (in which he resided), to ascertain all the available facts in relation to the variation of the magnetic needle throughout that State from its first settlement down to 1866 or 1867, but that except his surveys of Sargent's Purchase, &c., he had made no investigation in New Hampshire, except the State Line on Umbagog Lake, between 1858 and 1866 ; that in Maine he found the variation different in different places.

Subject to plaintiff's exception, interrogatory 16, in Barker's deposition, was ruled competent: " From your experience in this matter what, in your opinion, was the variation since 1832 up to the time you made said survey at Sargent's Purchase?"

Int. 27 was ruled competent, subject to plaintiff's exception : " Is there any reason that leads you to think that the north line of Sargent's Purchase, as you have described it, may not be far enough north for the quantity of land contained, and if so, what reason have you to think so,

and what comparison with any former survey have you made to lead you to think so?"

Int. 34: "State whether or not the Dorcas Merrill lot is located as granted by the Legislature?" Ans. "I do not understand it to have been so located."

Int. 35. "Did you ever examine to see where it would be according to the grant; and describe how the grant varies from the present location?" Ans. "I have so examined. The lower or southwesterly corner of the lot, as located on Rocky Branch, corresponds with the southwest corner as granted, and the granted lot would extend further south and further east than the lot as located."

Int. 36. "If you should take the northeast of the Merrill lot, as granted, as the point to commence at, how much would it add to the south end of Sargent's Purchase?"

Int. 37. "How would it change the west and north lines of Sargent's Purchase?" Ans. "It would carry the north line 60 chains and 80 links, or 243 rods and 5 links, further north than the line which I have this day described as the north line of said Purchase."

Int. 133. "From what information did you adopt the Dugway corner as the corner from which to locate the Dorcas Merrill lot according to the grant?" (Objected to by plaintiff's attorney.) Ans. "I became satisfied from the hearing of the testimony of John Emery on the taking of his deposition at Jackson, N. H., and from the location of the Emery lots at said Dugway corner, that said Emery had misinformed me in relation to the corner near the pine stump from which I first located said lot."

Plaintiff objected to the answer to Interrogatory 35, and renewed his objection after the reading of Interrogatory 133, but it was admitted, and plaintiff excepted.

Int. 53, by plaintiff. "Did Meserve tell you what the corner was before you came to Emery?" (Objected to by defendants.) Ans. "I think Meserve had called it an ash in connection with a maple, but we did not find the ash. The maple tree corner was the one that Meserve and I were after; I was after the corner of Sargent's Purchase, [but I found on examination of all the premises that this maple could not be the northeast corner of the Merrill lot, according to the grant and the proper point of beginning, and therefore abandoned it."] That part of the answer included in brackets was objected to by plaintiff as not responsive and as incompetent, and it was excluded, subject to defendants' exception.

28. Subject to plaintiff's exception, defendants were permitted to ask an expert in surveying: "What in your opinion should be the allowance in chaining over rough, rocky and uneven ground, or through woods on account of difficulty in making a straight or level chain?"

Defendants were also permitted, subject to plaintiff's exception, to ask one of their surveyors: "In the way you came at the distance of the west line of Sargent's Purchase, what, if any, allowance do you think ought to be made for any deficiency in measuring, other than what you understood to have been made?"

29.  George P. Meserve was called by plaintiff, and examined as to boundaries.  He was subsequently recalled by defendants, and testified as to the tax sale and other points in the defendants' case, and it appeared that he was agent of defendants.  Plaintiff then asked permission to put leading questions to Meserve, but this request was denied, subject to plaintiff's exception.

30.  This case was first tried at the April Term, 1864.  " After the trial had continued several days, the case was withdrawn from the jury by consent, for determining all the questions of law, raised by the ruling *pro forma* of the court during the trial."  When these questions should be determined the case was to be discharged.  Near the close of the transferred case is this statement:  " It was agreed that the Dorcas Merrill lot had been located and occupied before 1832 by bounds essentially varying from those described in the grant."  The court ruled that the plaintiff could use this as an admission of defendants, but also ruled subject to plaintiff's exception, that it was not conclusive on defendants. Subsequently Ossian Ray, Esq., one of the plaintiff's counsel testified, subject to defendants' exception, that at the former trial in 1864, the defendants claimed that the starting point or southeast corner from which to run out Sargent's Purchase by the polar survey, was the northeast corner of the Dorcas Merrill lot as located, and that the north line of their lot was based on that corner.

31.  It appeared that in 1852, the Summit House, near the top of Mount Washington was built by Rosebrook and others ; and that in June 1852, Rosebrook, having with him a loaded horse team, had a talk with John Bellows at the Glen.  Bellows' declarations on that occasion were excluded, subject to plaintiff's exception.  The court did not understand plaintiff to claim that Rosebrook acted under Bellows in building the Summit House.

32.  Subject to defendants' exception, Abraham Bedell, Jr., was allowed to testify :  " When I went on Mount Washington in 1851, I got leave of Bellows."  Plaintiff having introduced evidence tending to prove that the keepers of the Tip-Top House built under a leave from Bellows, and that under his leave, they used various paths leading from the summit, and conducted their guests to Tuckerman's Ravine ; defendants were allowed, subject to plaintiff's exception, to show that guests from the Crawford House, Fabyan's, &c., went over the mountain and to Tuckerman's Ravine, just as much as the people from the Tip-Top House ; and that the keepers of the Summit House piloted their guests about, in the same way.

33.  Andrew G. Lary testified, that in July 1850, Beals, who was connected with the Grand Trunk Railroad Company, requested him to go to Bellows to look out a road up the mountain ; subject to defendants' exception, he testified that Bellows, Beals and he went up near the present road as far as the ledge, about half way to the summit, then camped in the woods, and next morning came back on pony road.

(There was evidence tending to show that Bellows built part of pony road under a claim of ownership of the mountain).  The witness testified :  " Shouldn't think Beals laid any claim to the land up there."

1. Plaintiff contended that the northeast corner of Sargent's Purchase could not be further north than the point where the west line of Jackson adjoined Pinkham's Grant, but it was ruled otherwise. The court ruled that the grant to Sargent conveyed only 24,850 acres.

34. Plaintiff contended that if the evidence given by S. Alexander was held to be incompetent for the purpose which plaintiff had in view when introducing it, then defendants could not use it for any other purpose.

35. Ruled otherwise and plaintiff excepted. Defendants excepted to the exclusion of a bill once pending before the Legislature (but not passed), to define the bounds of Thompson & Meserve's Purchase.

In what follows it is not intended to state all the instructions to the jury, but mainly those portions to which it has been supposed, objections might be made.

In relation to the evidence of the possession of John Bellows, the jury were instructed substantially as follows :

36. The possession of a tenant or licensee is the possession of the landlord or licensor ; therefore plaintiff need not show that Bellows occupied in person ; that so far as Bellows was shown to have been in actual possession, this gave plaintiff a better right than defendants, unless defendants show, either title in themselves, or prior actual possession, or a prior entry on some part of the premises embraced in a deed which included the land in controversy. An entry upon part, or possession of part, of the disputed tract, claiming the whole, without color of title (Bellows not having color of title) gives no possession of any part except that which is actually entered upon and occupied ; the possession is not extended beyond the actual occupation. But in order to constitute an entry upon, or occupation of, any premises, it is not necessary that every foot of the land should be entered upon or occupied. If the land is not arable, and is used by the person entering, up to any line or point for the purposes for which such a tract of land would ordinarily be used, all the use being made of it which, taking into account the situation and nature of the tract, would be beneficial to the owner, then the use in this way up to a certain point would be an occupation of the land up to that point. Surveying a wood lot and marking the bounds would give possession of the tract enclosed in the bounds ; so acts at Tip-Top House, and cutting timber part way down the mountain, or taking specimens from Tuckerman's Ravine, if all done under the same claim, would give possession of the land intervening between Tip-Top House and those places, that is, if these were the only purposes for which such land could ordinarily be beneficially used.

If the mountain was used on the summit and on different divergent lines (or paths) for some distance below the summit, for all ordinary purposes for which such property would naturally be used by anybody, that would be, in effect, actual possession of all the spaces between these divergent lines as far down as used under a claim of right, if used under a claim of ownership in Bellows as his tenants or licensees. If the occupation extended on different lines to different distances from the summit, then this would be possession of

the spaces or triangles included between these different lines and a line drawn from the lower limit of occupation on one line to the lower limit of occupation on the next line, and so on.   But none of this occupation of the summit, or of these lines, is of any avail to plaintiff unless done by Spaulding, Bedell and others, intending and claiming (though not necessarily verbally), to do these acts by virtue of authority of Bellows (and not as squatters), and under a claim on the part of Bellows to be the owner of the tract so occupied.   Any part of this occupation not coming within the above rule must be disregarded, and only that part which was under such claims as the above can give the plaintiff a right to recover.

37.   The use of the same land by other persons for the same, or some of the same purposes, if not under a claim of ownership, would not prevent plaintiff from acquiring a possessory right as against one who shows no title.

38.   The jury were instructed, in substance, that the starting point for ascertaining the bounds of Sargent's Purchase was the northeast corner of the Dorcas Merrill lot as granted, unless the jury should find that, at the date of the grant to Sargent, that lot had been practically located upon the ground in a manner to bind the parties to it, in which case the northeast corner, as then located, should be taken as the northeast corner, intended in the deed to Sargent; that a practical location is an actual designation by the parties upon the ground of the monuments and bounds called for by the deed; the marking out of the lot upon the ground by definite bounds and monuments, with the assent of the surrounding owners either at the time of making, or subsequently, if before the deed to Sargent.

39.   That there was no direct evidence of the assent of some or all the surrounding owners, especially not of the State, but that defendants, having once admitted that the D. M. lot was located before Sargent's deed by bounds essentially varying from those named in the grant, and there being no evidence that there was any other lot in that vicinity occupied by Dorcas Merrill, the jury might weigh these admissions as elements of evidence in the case, and might find from them all the facts necessary to establish the location of the Dorcas Merrill lot within the bounds claimed by plaintiff.   The jury were, however, told that these admissions were not conclusive on defendants, and that they were not *obliged* to find as it was above intimated, they *might* find if they saw fit.

In the same connection the jury were told that they might draw such inferences as they thought proper, from the fact that some or all of the surveys of Sargent's Purchase, made for defendants, started from the D. M. lot, as the plaintiff claimed it to be located, and not from the D. M. lot as granted.

10.   A special question was submitted to the jury as to whether the sheriff sold, at the tax sale, anything more than the unorganized part of Sargent's Purchase.

Upon this the jury were instructed somewhat as follows, viz :   That the question was not what the sheriff thought he was selling, but what

he did put up and strike off. If he said anything, what did he say, not what did he suppose was within the terms of his offer? The words "Sargent's Purchase" in his warrant meant in law, the unorganized part of Sargent's Purchase"; and if he simply said, "I offer Sargent's Purchase," that would mean the unorganized part only; but if the sheriff referred to the plan and said, "I offer Sargent's Purchase, as described in this plan" or "I offer Sargent's Purchase, except certain lots" (naming them) "the situation of which appear on this plan," then he would have been selling the whole of the original Sargent's Purchase.

The questions of law were reserved.

*H. & G. A. Bingham*, and *Ray & Ladd, for plaintiff.*

I. The agreement is a conclusive piece of evidence between the parties that there were no "outs" to Sargent's Purchase, except such as defendants notified the plaintiff of by March 1st, 1868. Greenleaf's Ev. vol. 1, §§ 27, 186; *Alton* v. *Gilmanton*, 2 N. H. 522.

The court will not set aside except it appear that the agreement was made by mistake, fraud or surprise and properly brought before the court for that purpose. *Alton* v. *Gilmanton*, before cited; *Bellows* v. *Stone*, 14 N. H. 202; *Burbank* v. *Rockingham Mutual Fire Insurance Co.*, 24 N. H. 505.

The only cause assigned here is that the agreement operates harshly and unjustly upon the defendants. This is no sufficient cause for setting aside a solemn agreement of this character, if it was true. It is not true, however, and should the court hold it sufficient, the plaintiff asks the opportunity to show its falsity and the wrong and injury it would do him, by affidavit or otherwise.

The defendants' tax deed describes the land conveyed as "the whole of the unorganized and unincorporated place *called* Sargent's Purchase."

Under this deed the defendants could take nothing except what was then known and *called* Sargent's Purchase. See Meserve's testimony in case, page 501, *ante*. He says, "I make no mention of any lots or grants said to come within the boundaries of that plan. I used the plan." Hence it can be no object for defendants to seek for "outs" not then known or reserved from the operation of the sale within the known boundaries of Sargent's Purchase.

II. The printed case shows that James Willey, deceased, had knowledge of the boundaries of Thompson & Meserve's, Chandler's, and Sargent's Purchase, as well as of most of the tracts of land adjoining them in that vicinity. That he was disinterested. His sayings as to these boundaries were competent evidence. *Adams* v. *Blodgett*, (Grafton county) not reported; *Smith* v. *Powers* 15 N. H. 563, and authorities cited; *Moulton* v. *Marshall*, 22 N. H., 381; *Great Falls Co.* v. *Worster*, 15 N. H. 413.

III. The ruling of the court (see case, page 512, *ante*), as to there

being no competent evidence in the case to be submitted to the jury from which they might find the boundaries of Thompson & Meserve's Purchase was clearly erroneous.

1st.   The evidence, if it had any tendency to show them was competent, however slight.   *Tucker* v. *Pushee* 34 N. H. 168.

An examination of the deeds to Sargent, Chandler, and Thompson & Meserve will show that the evidence locating the west line of Sargent's Purchase located the west line of Thompson & Meserve, as it was but a continuation of the same line north.

The evidence of S. W. Thompson showed that Willey took the proper course, to ascertain the boundaries of Sargent's Purchase—which being done, established the west line of T. & M., and that then he went on to T. & M, and surveyed that, and put up the bounds.   That he went with Willey and assisted in tracing and erecting those boundaries. The east and north line of T. & M.'s Purchase were well known.

Now Thompson's testimony further shows that Willey told him that when he was at the northwest corner of T. & M., Willey pointed out the northeast corner of Chandler, and that when running south he said he was on the line of Chandler's Grant far enough to make 12,000 acres, and there erected a pile of stones, &c.   See case, pages 510 and 511, *ante*.   Thompson also says that from this point ran the south line which passed nearly a mile south of the top of Mount Washington. The evidence then tends to prove where the 12,000 acres were located, and that Mount Washington was within the limits.   This case, when previously transferred, did not show that Willey and Thompson, when they run south, did so on Chandler's line ; hence held incompetent as showing the location of Mount Washington.   See Judge Bartlett's opinion, 4th page.   This being supplied, the testimony was competent and should have been submitted to the jury.

Again, the entry of Thompson under this deed, claiming to those bounds, gave the plaintiff the right to maintain the action to those bounds as against a stranger, though there might be doubt as to those bounds being in the right place.   *Poor* v. *Gibson*, 32 N. H. 417, charge of court; *Jackway* v. *Barnett*, 38 Vt. 324; *Barton* v. *La Zelle*, 16 Vt. 158.

IV.   The defendants should have been confined to evidence as to " outs" in Sargent's Purchase, to what was known and reckoned out (if any) at the time of the tax sale.   The deed only conveyed what was then *called* Sargent's Purchase.   The question was, what unorganized and unincorporated lands were called Sargent's Purchase at the time of the sale.   This appears clearly from the testimony of Meserve.   See case, page 501, *ante*.   Can the defendants throw out new land within the boundaries of the plans exhibited and sold, and substitute for it other land outside of it that was not then known or sold ?   Such looseness in a sale would avoid a sale of personal property on an execution. *True* v. *Congdon*, 44 N. H. 56 ; *Jones* v. *Railroad*, 32 N. H. 551.

V.   The defendants' evidence of an allotment was clearly insufficient.

VI.  The  evidence of defendants  as  to  copy of deed of  Willey to Thompson & Meserve  was improperly admitted.  By the terms of  the agreement the plaintiff's copy was admitted to be a correct statement of plaintiff's title.  *Alton* v. *Gilmanton*, 2 N. H. 520.

The record of Coos county, of the  deed, was  sufficient evidence of the correctness of the copy and avoids the decision of  the question suggested in the case by the presiding justice.  Laws of N. H. ed. 1830, page 533.

VII.  As  to the admissibility of the defendants' plans by Willey and the copies of  the  same, see *Gibson* v.  *Poor*, 21 N. H. 440 ; *Whitehouse*  v. *Bickford*, 29  N.  H.  480 ;  *Whitney*  v. *Smith*,  10 N. H. 43 ; *Adams* v. *Stanyan*, 24 N. H. 405.

VIII.  The copies of deeds of Buckman to Atkinson, and  Atkinson to McMillen, were properly excluded. . No possession had ever accompanied them and their execution should have  been °proved.  *Homer* v. *Cilley*, 14 N. H. 85.

IX.   The ruling of the court as to the boundaries of Adams was correct.  "By State's land" means along the external boundary of it.  *Peaslee* v. *Gee*, 19 N. H. 273 ; *Bradley* v. *Rice*, 13 Maine 198 ; Cruise's Digest, vol. 2, page 639, note ; *Hall* v. *Davis*, 36 N. H. 569.

X.   Plaintiff claims that if at the time of  the grant to Sargent there was a Dorcas Eastman lot by occupation, having definite boundaries and corners marked upon the  ground, also  a  lot  described by corners and distances in a deed differing from those marked on the ground, and that the lot, as occupied, was occupied as given from the State of New Hampshire,  there  was a  latent ambiguity which authorized the introduction of parol evidence to show which of the  two the language in Sargent's deed refers to.  Morrison's Digest, page 352, Nos. 515–17.

XI.  The agreement in the prior printed case, that the Morrill lot had been located and occupied prior to 1832, by different  bounds from those described in the grant was a solemn admission made in court, and was conclusive upon the defendants.  Greenleaf's Ev. vol. 1, §§ 27 and 186 ; *Alton* v. *Gilmanton,* before cited ; *Burbank* v. *Fire Insurance Company.*

XII.  The plaintiff claims  that from the evidence appearing in the case, and from what he offered to show on that point that was excluded, there was evidence competent to be submitted to the jury as tending to show the maple tree corner, the southeast  corner of Sargent's Purchase by estoppel, by  a practical location,  by  agreement and  acquiescence. *Prescott* v. *Hawkins*, 12 N.  H.  19 ; *Brown* v. *Gay*, 3  Greenleaf 126 ;  *Esmond* v.  *Tarbox*, 7  Greenleaf 61 ;  *Jackson* v.  *Ogden*, 7 Johnson 238 ; *Rockwell* v. *Adams*, 7 Cowan 761 ; *Jackson* v. *Vedder*, 3 Johnson 8 and note ; *Adams* v. *Rockwell*, 14 Wendell 285 ; *Kellogg* v. *Smith*, 7 Cushing 375 ; *Richardson* v. *Chickering*, 41

N. H. 380; *Dudley* v. *Elkins*, 39 N. H. 78; *Hobbs* v. *Cram*, 22 N. H. 130; *Russell* v. *Allard*, 18 N. H. 225; Morrison's Digest, page 119 No. 36.

XIII. In the matter of the tax title, the plaintiff insists upon his objections as stated in the printed case, and cites Blackwell on Tax Titles, page 281; *Hayden* v. *Foster*, 13 Pick. 492; *Wells* v. *Burbank*, 17 N. H. 393; Statute of July 4th 1829, sec. 2, N. H. Laws printed in 1830, page 564.

*Fletcher & Heywood*, and *Burns*, for defendants.

The agreement (see case, page 494, *ante*), was intended to provide for the trial which was had at the April term, 1868. We think that this appears from the presiding justice's statement of the circumstances under which it was made, and from the agreement itself. And the court have full control over such agreements and may set them aside. This is a matter of discretion, and will be done when it is made to appear probable that to enforce the agreement would operate unjustly. *Alton* v. *Gilmanton*, 2 N. H. 520. If the agreement operates as a surprise upon a party, it may be set aside. *Bellows* v. *Stone*, 14 N. H. 175. There is no evidence that a correct survey was ever made of Thompson & Meserve's Purchase. We think, on the other hand, that it appears, from the case, that no such survey was made. If this is so, Willey could not have knowledge as to where the boundaries were and his declaration should not be received.

The first requisite is that the person whose declaration is offered should have means of knowledge. *Melvin* v. *Marshall*, 22 N. H. 379; *Smith* v. *Powers*, 15 N. H. 546; *Adams* v. *Stanyan*, 24 N. H. 405; *Great Falls Company* v. *Worster*, 15 N. H. 413.

There is the testimony of Thompson that he and Mr. Willey made some examination of the locality before the grant was made, but not in a way to have any accurate knowledge of the boundaries as defined by the deed, and there is no evidence that he was ever there at any other time. Therefore no foundation was laid for the admission of his declarations.

The rule upon this matter is: In questions of boundaries, declarations as to the common opinion of the place made by deceased persons who from their situation had means of knowledge, and no interest to misrepresent, have been generally considered as admissible. *Shepherd* v. *Thompson*, 4 N. H. 213. We contend that Bellows' entry upon Mount Washington does not inure to the benefit of Wells unless the place where he entered is really in Thompson & Meserve's Purchase. If this action was in the name of Bellows, and the place where he entered is within the boundaries set forth in the first count in his writ, then there would be no doubt that his entry would avail him against all wrong-doers and persons having no better title. *Poor* v. *Gibson*, 32 N. H. 415. But Bellows conveyed Thompson & Meserve's Purchase to Wells not by any boundaries, and unless it is first shown that the place

where Bellows entered is in Thompson & Meserve's Purchase, the bene-fit of that entry was not conveyed to Wells as it was outside of his claim.

An entry, to be effectual and make a seisin, must be upon the land. Coke Litt. sec. 418, 419 ; *Proprietors of Enfield* v. *Day*, 7 N. H. 457 ; *Hale* v. *Glidden*, 10 N. H. 397 ; *Edwards* v. *Griffin*, 4 N. H. 529. A deed cannot be color of title beyond what it purports to convey. . *Woods* v. *Banks*, 14 N. H. 111 ; *Hoag* v. *Wallace*, 28 N. H. 547. The only testimony in the case, that can be said to prove any thing in regard to the distance southwest of Thompson & Meserve's Purchase may go, is that of Joseph Pitman. His testimony tends to show that a line run from the northeast corner of Chandler's Purchase in a direction nearly south will extend 111 rods south of the " Tip-Top House." And there is no evidence whatever that the calls of the grant would go 800 rods south of that corner of Chandler's Purchase, and there are no data given upon which any such distance can be come at. The 800 rods is an arbitrary distance assumed to be right without any proof that it is so. S. M. Thomson testified on the last trial as he did on the first, and it was decided on the first case that his testimony was not competent to show a location of Thompson & Meserve's Purchase.

The entry of Thompson upon the purchase conveyed to him and Me-serve did give them a seisin according to their deed but no further. *Edwards* v. *Griffin*, *Hale* v. *Glidden*, and *Proprietors of Enfield* v. *Day*, before cited. As to ancient plans see *Whitehouse* v. *Bick-ford*, 29 N. H. 471 ; *Gibson* v. *Poor*, 21 N. H. 440.

Upon the question as to what grants had been made of lands falling within the limits of Sargent's Purchase and that should therefore be ex-cluded and the same quantity added to the north end of the grant, we contend that copies should be received. The proper foundation was laid for the introduction of secondary evidence. *Loomis* v. *Bedell*, 11 N. H.,(see page 36,) where the court say : "It is only where he claims title through deeds which have been recorded, that he is entitled to offer copies in evidence, without an effort first to produce the original. *Homer* v. *Cilley*, 14 N. H. 85 ; *Andrews* v. *Davidson*, 17 N. H. 413, see page 415 ; *Johnson* v. *Brown*, 31 N. H. 405, see page 411 ; *Poignard* v. *Smith*, 8 Pick. 272 ; *Bowman* v. *Sanborn*, 25 N. H. 87 ; *Smyth* v. *Carlisle*, 16 N. H. 464 ; *Thatcher* v. *Phinney*, 7 Allen 146 ; *Wood* v. *Fuller*, 15 Pick. 185 ; *Melcher* v. *Flanders*, 40 N. H. 156. The deed given by the sheriff to Williams conveyed Sargent's Purchase as it existed at the time of the sale. That grant of land was defined by the deed that Willey, the Land Commissioner, made to Jacob Sargent and others. A portion of the grant had in 1837 been annexed to Jackson. But there remained a large tract which was still Sargent's Purchase and was the same same tract mentioned in the act for the apportionment of taxes. Now the plaintiff's counsel say, that, in order to locate the place and to ascertain what land was included in it, we must inquire as to what the sheriff and the purchaser understood at the time of the sale. We say, that, to find where Sargent's Purchase is and what it includes, we must locate it according to the deed, and then

all that of it that has not been severed from it and put into Jackson was Sargent's Purchase at the time of the sale. *Newmarket Manufacturing Company* v. *Pendergast*, 34 N. H. 54 ; *Ela* v. *Card*, 2 N. H. 175 ; *Peaslee* v. *Gee*, 19 N. H. 273 ; *Flagg* v. *Thurston*, 13 Pick. 145.

On the first trial the case says that "it was agreed that the Dorcas Merrill lot was located and occupied before 1832, by lines essentially varying from those described in the grant." There is no case, we think, where a party has been held to be concluded by an admission of this kind, unless it was made in the form of a written agreement on an admission, entered of record. There are many things conceded for the purpose of shortening a trial. That we understand to be done merely for the purposes of that trial, and the first case was drawn for the purpose of raising questions of law.

The concession amounts to very little as it does not appear that any particular location was conceded. U. S. Annual Dig. 1849, p. 215, sec. 286.

The opinion of Judge Bartlett makes it clear that the words of this grant cannot be altered by parol, and that the corner is to be found by looking at the terms of the deed. And there was never any occupation of Sargent's Purchase, and it was not proved that any one owning that grant so acquiesced in a particular course as to be bound. There was no practical location by agreement of parties varying from the description in the deed. In this case there was not as much evidence of a practical location as in the case of *Prescott* v. *Hawkins*, cited for the plaintiff, and in that case it was decided there was no practical location.

This is not a case where there was an original survey as in the case of *Brown* v. *Gay*, cited by the plaintiff's counsel. An original survey of a township is binding upon principles that have no application in this case.

The principles decided in the case referred to by plaintiff's counsel are, that an original survey is to stand, however erroneous it may be, and that adjoining owners may by agreement or acquiescence establish a line varying from the true line. And we do not see that there was any evidence to pursue any one of these states of facts in this case.

The tax title was very fully examined by Judge Bartlett in his opinion on the former case, and we think that by our testimony on the last trial we obviated all of the difficulties then found in the proceedings as set forth in the former case.

SARGENT, J.* 1. The plaintiff claims the summit of Mount Washington in this suit as being within the limits of Thompson . & Meserve's Purchase, which was granted by Willey, the State Commissioner, September 10, 1835 ; while the defendants claim the same summit, as being a part of Sargent's Purchase, which was granted by the same Willey, May 31, 1832.

As the defendants' grant was earlier in date, if the the two grants

---

* Perley, C. J., and Bellows, J., did not sit.

should be found to overlap and cover the same ground in part, or, in other words, if each grant in terms should be found to cover the summit of Mount Washington, then the prior grant, that under which the defendants claim, would hold the *locus in quo.*

But it will also be observed that neither of these grants is bounded by or upon the other, so as to cover and include all the land, but they are each described in such a way that when both are run out according to the courses and distances and monuments called for in each grant, it may happen that there shall be a strip of land, more or less, between the two ; and the summit of Mount Washington for which both are contending in this suit, may prove not to be included in either grant, and not to belong to either of these parties.

Defendants' grant, which is the earlier, has this description :   " Beginning on the northeast corner of a lot of land given to widow Dorcas Eastman, of said Bartlett, by the Legislature of New Hampshire, thence running due west three and one fourth miles, thence due north so far as that a due east course extending to the west line of the town of Jackson or Pinkham's Grant shall contain 25,000 acres ; thence southerly on said westerly line of Jackson to the southwesterly corner thereof ; thence south, so far as that a due west course shall strike the first mentioned bounds ; excepting 150 acres which I have sold Otis Eastman belonging in said described premises, as his deed will more fully show ; and if any of the above described premises have heretofore been granted by authority of said State, they are to be reserved out of the same, and as many acres annexed on the northerly end of the above described tract, adjoining Pinkham's Grant."

The first question that here arises is whether the 150 acres which Willey, the same Commissioner, had previously granted to Otis Eastman, is to be deducted from the 25,000 acres included in the grant, or whether the grant was of 25,000 besides that ?   We think, from an examination of the grant, its peculiar terms and limitations, that the construction which the court gave to it was the correct one, and that the Otis Eastman grant of 150 acres must be taken out of the 25,000 included in the general description, which would leave only 24,850 acres granted to Sargent.

This Eastman grant did not stand upon the same ground as the other reservations did.   That grant had been made by Willey, the same Commissioner who granted Sargent's Purchase, and afterwards Thompson & Meserve's Purchase, and what he had thus granted there was no uncertainty about ; and we think it evident that he intended to except that out of the general description ; but if any of said described premises had been previously conveyed by some other person in behalf of the State, and concerning which Willey might have no knowledge, then provision is made that this grant to Sargent shall extend far enough north to include other land outside the lines described, and outside the 25,000 acres so as to make compensation for such previous grants.

By some of the plans, the Otis Eastman lot would appear to come only partly within the limits of Sargent's Purchase. If such should

prove to be the fact, then only so much of it is to be deducted from the 25,000 as is thus included within the limits of the grant.

It may be properly noticed here also, that there is no reversionary interest or remainder in these grants that had been previously made, if any, conveyed to Sargent. Such grants, if any, are expressly reserved in the grant to Sargent and he is to have enough on the north of his grant to compensate for such prior grants. He is not to have whatever interest the State had, whether in possession or remainder, but he has the interest of the State in all that had not previously been granted; but if any had been thus previously granted, so much was expressly reserved and compensation therefor was made on the north.

Now if these previous grants, if any, should in any way revert or be forfeited, they would not go to Sargent, or his heirs or assigns, but to the State. Hence no question arises as to the occupation of any such previous grants or the rights of the grantees therein; these are matters between such grantees and the State; but Sargent and his grantees are only to show that the State had previously granted any portion of this territory, in order to be entitled to his addition on the north, without inquiring whether the grantees have ever asserted any right, or claimed their land or not.

The State may inquire concerning that matter and may assert any rights which it has in the premises, but no such contingent or uncertain interest was conveyed to Sargent.

But it will be observed that while all such prior conveyances are to be deducted, and compensation is to be made therefor on the north of the grant, yet that all such additions, by the terms of the grant, are " to be annexed to the northerly end of the grant, *adjoining Pinkham's Grant.*"

Pinkham's Grant was on the east of Sargent's Purchase and so extending northerly or northeasterly. Whether this addition is to be made in the form of a square or a triangle with the side extending upon Pinkham's Grant of equal length with the one extending upon the north line of Sargent's Purchase, or in what particular form it is to be made, may be a question of interest on another trial, if any prior grants are proved to fall within the limits of Sargent's Purchase.

2. The agreement that was made, and from which the defendants now seek to be relieved, was neither wholly a voluntary agreement, nor wholly a compulsory one, but would seem to partake of the nature of both in some particulars. The plaintiff desired a trial; the defendants desired a continuance; the court intimated that some arrangement of this kind must be made by defendants in order to obtain the continuance; whereupon, in part, by way of submitting to terms, and in part, as a voluntary arrangement with the plaintiff, the agreement was made and the continuance granted.

At the trial, at the term subsequent to this agreement, the defendants were held up to its terms, and the papers were furnished to plaintiff according to this agreement so far as came to the knowledge of the defendants.

There is no claim, nor any ground for any, that we are aware of,

that the defendants did not act in good faith and give notice of all the *outs* that they then knew of; nothing was fraudulently concealed or kept back by them. That trial went on and resulted in a disagreement of the jury; and now the parties are to have a new trial; and the defendants say that they have, since the other trial, made important discoveries in regard to their title, unknown to them before—discoveries which may seriously affect their rights; and which they claim the court ought in some way to allow them to avail themselves of. Defendants have furnished us with an affidavit as to these new discoveries, which, in some views of the defendants' case, may become very important to them; such as might, if the case should turn in a particular way, authorize the court to grant a new trial after the verdict, on the ground of newly discovered evidence, clearly such as would authorize the court to allow an amendment of the pleadings, if it were a case of review, so that the action would not be tried on the same issues upon review as before.

What was the object of the court and of the parties in entering into this arrangement in the first place? The plaintiff was ready for trial. He had a *prima facie* case on which he was willing to rest till the defendants should put in their case. He might then be prepared to go along, or he might be surprised by the defendants' evidence and be obliged to ask for a continuance in order to meet it. To avoid this latter event, it was stipulated that the defendants should give the plaintiff notice of their title and claims, seasonably, so that plaintiff might have ample time to meet such claims and perfect the trial at the next term. This was all accomplished, and the trial was completed, and the object of the agreement, whether regarded as a voluntary or a compulsory one was fully accomplished. The fact that the jury did not agree upon a verdict does not change the aspect of the case.

But we can hardly suppose that it was the intention of the court or the parties to hold these parties forever to their contract, provided any new discoveries should be made which would make such contract operate to bar or prejudice the substantial rights of the parties. The intimation was made by the court, and the agreement was entered into by the parties for the purpose of facilitating the trial; and, taking all the facts as they were then supposed and understood to be by both sides, the order and agreement were well enough and operated no injustice to any one. But suppose it should be afterwards found that there were claims, which neither party knew of and could not, by the exercise of ordinary care, have known, that should enlarge the defendants' claim so that there could be no doubt about their right to recover in this suit if they were allowed to put in their whole case, and unless they were allowed to do so, their defeat would be equally certain, would not the court, in such case, upon some terms, allow the party to show the whole truth?

If the arrangement which was made be considered as terms imposed by the court upon the defendants for the continuance which was granted them, then the court would modify its order, so as to impose as heavy terms upon the defendants as it was intended to impose at the time, but which will not necessarily sacrifice their whole case; or if this arrangement be regarded as an agreement of the parties, then the defendants

would be released upon some terms from a bargain, which, as the parties then understood the facts, was fair and equitable, but which, when viewed in the light of the newly discovered facts would make it utterly unconscionable to be performed or enforced. The change in the known circumstances of the party may make it necessary that he should be relieved from his contract in order to prevent gross injustice, if it appear that the agreement was made under a misapprehension of the real facts in the case; and if such a case is made, the court should prevent such injustice and grant the party such relief as will enable him to try his case on its real merits.

In *Alton* v. *Gilmanton*, 2 N. H. 522, the court in speaking of an agreement made by the parties in that case, said: " We consider this agreement as a portion of the materials from which the record is to be made up, and will not suffer the counsel or their clients to depart from it, unless on evidence to us that the agreement was made by mistake, fraud, or surprise;" and they add: " Such facts appearing by affidavit, we could allow the agreement, like a plea under similar circumstances, to be withdrawn from the files; but without such affidavit it must be held conclusive." And the cases go to the extent that such agreements are binding and conclusive upon the parties, unless upon a case made to the court they get relieved from them upon the ground that such agreement was made by mistake or surprise or fraud or under some misapprehension of the real facts in the case. So it is held that an agreed case will be discharged if it is made to appear that through fraud, accident, mistake or misapprehension, the case embraces matters which did not exist, or does not contain facts which did exist at the time of the agreement and transfer and which were material to a proper determination of the rights of the parties. *Haywood* v. *Wingate*, 14 N. H. 73; *Goodrich* v. *Eastern Railroad*, 38 N. H. 395; *Richardson* v. *Higgins*, 23 N. H. 119; *Gregory* v. *Pierce*, 4 Met. 478; *Bellows* v. *Stone*, 14 N. H. 175.

If it shall appear that the agreement in this case was made through any mistake, or any misapprehension of the real facts in the case, on the part of the defendant, so that it embraces matters which did not exist, or does not contain facts which did exist, at the time it was made and which are material to a proper determination of the rights of the parties, then the defendants should be relieved from such agreement in such away and upon such terms as shall seem to be just. This was not a solemn admission of a fact with full knowledge of the circumstances, but it may prove to be an agreement made under a mistake or a misapprehension in regard to the real facts in the case such as ought to entitle the party laboring under it to some relief. This matter can be fully heard on both sides if desired, and considered by the court at the trial term and such order made as shall appear to be just.

3. We do not understand the exception which was taken to the copy of the deed from Willey to Thompson and Meserve, to be insisted on. That James Willey was a witness and a grantor, as agent of the State, in the same deed, might have been a valid objection, had it not been proved that there were two James Willeys residing in Conway

at the time of the execution of this deed.   It might be fair to presume, under such circumstances, that the one who could be a legally competent witness was the witness to the deed, until some evidence was introduced to show the contrary.   But this deed was clearly within the terms of the agreement into which the defendants entered, and concerning which there is no claim that the parties should not both be bound, nor do we understand that defendants seek to be relieved from his agreement so far as any evidence of this kind is concerned.

4.  The testimony of Thompson, after his cross-examination, became incompetent and was properly excluded, as was his testimony on a subsequent page of the printed case.

5.  The deed from Willey of the Iron Ore Tract was properly admitted, and the testimony of James C. Willey as to what his father said when leaving home, as to where he was going and what he was intending to do, was properly rejected.

In order that declarations accompanying an act may become competent as a part of the *res gestae,* they must not only relate to those acts and explain them, but the acts themselves must be relevant and material, independently of what was said.   *Morrill* v. *Foster*, 32 N. H. 360.   Here the act of Willey in going from his house or home had no necessary connection with the bounds of Thompson & Meserve's Purchase.   James Willey's minutes of the survey were also properly excluded ; they would have been merely hearsay if admitted, and it did not appear that the deeds followed, or were intended to follow, the surveys. So the testimony of Thompson in that connection should have gone out of the case with all his other statements that we have considered, as in the end he was shown to have no knowledge about it.   He was not a surveyor and therefore had no knowledge and could not testify as an expert, and the rest was simply what he heard Willey say when he was making a certain survey or, more properly speaking, a reconnoissance in that neighborhood, some days before the deed was executed, to which no allusion is made in the deed and none of the objects or monuments found or made or located during that reconnoissance, as spoken of by Thompson, are called for or alluded to in the deed ; but, from the description in the deed, it is evident that it was the design to grant a certain quantity of land by measure extending from a given line on the north without regard to any bounds or monuments on the south.

The five questions to Thompson (see case, page 498, *ante,*) for these reasons and those stated in the former opinion in this case, were properly excluded.

6.  There was no valid objection that we see to the question to and the answer of S. F. Spaulding.

7.  The statement of Thompson that the road was on one occasion barred by pole and chains and no one allowed to pass till they had obtained Bellows' permission, with much other evidence bearing upon the fact of Bellows' possession of the summit of the mountain, and his claim to the same, were probably competent on the question of possession ; but in the view that we take of certain points in this case, that evidence will not be likely to be important upon another trial and we have not given it much attention.

8.   The motion for a nonsuit, with the ruling upon it, raises one of the most important questions of the case.   We think 'that the ruling of the court that no competent evidence had been produced upon which the jury could ascertain the location or bounds of Thompson & Meserve's Purchase, and that plaintiff could not recover under the paper title from the State nor upon the second count in the writ, was correct. There has been no evidence of any survey, or any attempt to survey, this grant as it was granted, viz :—" Beginning at the northwest corner of Pinkham's Grant, thence running westerly to the south line of Shelburne Addition and the south line of Low & Burbank's Grant to the northeast corner of Jeremiah Chandler's Grant; thence due south on the east line of said Chandler's Grant so far that a due east line extending to the west line of said Pinkham's Grant, shall contain 12,000 acres, thence northerly on said west line to the first bound." Date July 8, 1835.

Now the resolution of the Legislature of June 16, 1824 was that land be granted to Pinkham, on condition that he built a road (the land to extend one half mile from the road on each side), from Adams (now Jackson) to Durand (now Randolph).

Also resolution of July 4, 1834 directing Treasurer to convey said lands to Pinkham.

Plaintiff objected that this was not the grant to Pinkham referred to in subsequent conveyances but they show no other or different grant to Pinkham.

We find in *Bellows* v. *Copp* 20 N. H. 592, that there had been some prior grants to other persons of portions of the land granted to Pinkham, which, of course, he did not hold. But that suit was not commenced till 1841.   But the grant to Thompson & Meserve being made in 1835 soon after the Legislature had directed the conveyance of the land to Pinkham, the question is where the northwest corner of Pinkham's Grant in 1835 was, not how much land Pinkham was finally able to hold under his grant?   That would have nothing to do with the starting point in running out Thompson & Meserve's Purchase.

The *grant* to Pinkham must probably determine the starting point of Thompson & Meserve's Purchase, and not the amount of land held by Pinkham under his grant.   Taking his grant as granted, and beginning at the northwest corner thereof, would probably give the proper starting point for the plaintiff in running out Thompson & Meserve's Purchase.   The evidence on that point in this case was not very full or definite, but it would seem, so far as we can judge, that this starting point must be upon Randolph line, or .near there, in the town of Gorham.   That will probably be made plainer by the evidence on another trial.   When the starting point shall thus be fixed, and Thompson & Meserve's Purchase shall be run out according to the original grant, there will be some evidence as to its proper location and extent, and as to whether it embraces the summit of Mount Washington or not.

It will be observed that this grant gives no right to compensation for any portion or all that may have been previously granted within the

same limits.   It only includes so many acres of land, and if it should be proved that any portion of this land had been previously granted, that would take so much from this grant without any right to compensation in any other place.   Now it is very clear that there is no evidence in this case tending to show that the summit of Mount Washington is within the limits of Thompson & Meserve's Purchase as granted. Can the plaintiff prevail on the ground of a prior possession?

In the former opinion in this case, although it was held as here that there was no evidence that the summit of Mount Washington was within the grant to Thompson & Meserve, and that plaintiff could not recover on his second count, yet it was there held that the motion for a nonsuit was properly denied because there was evidence that John Bellows had possession of the summit of the mountain at various times between 1851 and 1859 and that this was evidence of his seizure as against the defendant who had then shown no title; and it was also said that *the deed from Bellows to plaintiff would give the latter such seisin as would enable him to maintain this action against one who showed no evidence of title*; and to this latter point the following authorities are cited, *Edmonds* v. *Griffin*, 41 N. H. 532 ; *Tappan* v. *Tappan*, 36 N. H. 120 ; *Carter* v. *Beals*, 44 N. H. 413 ; *Ward* v. *Fuller*, 15 Pick. 185.

In *Edmonds* v. *Griffin*, plaintiff's grantor had entered upon the land and then quitclaimed to plaintiff, and there was direct evidence introduced that the land in dispute was covered by the description in plaintiff's deed.

Defendants offered in that case to prove that the title put in by plaintiff did not cover the land in controversy, and to show more particularly the manner of said Graham's occupation, but claimed no title to the premises themselves.

But the court, at the trial term, among other things, ruled that the plaintiff having established a *prima facie* title, the defendants must show title in themselves in order to maintain their defence.   But in the opinion of the court, that ruling was held to be erroneous, and it was held, Bellows, J., delivering the opinion, that the defendants should have been allowed to prove that the land in dispute was not included in the plaintiff's deed ; for in that case the right of the plaintiff might have been limited to what he actually occupied ; and that it was competent, where a joint disseisin was charged and admitted and the issue being thus upon the demandant's title, for the defendants to show that the demandant's seisin did not extend to the land in dispute or a part of it. This is an authority that an entry by one upon a lot of land under color of title gave him seisin of the whole lot, and that this seisin might be transferred to plaintiff by a quitclaim deed, yet it goes to show that, unless the plaintiff had introduced evidence that the *locus in quo* was in fact included in his deed, such entry of his grantor could not avail him. It is clearly not an authority that a man who has a deed of a certain tract of land, but who goes outside his deed and commits a trespass upon another and then sells and conveys his lot simply, can give his grantee any right to repeat the trespass upon the land of a third person.

It would seem absurd to hold that the entry upon land, by a person who had no color of title to it, the entry being a mere trespass, could be assigned to another so as to give him any seisin of the land so entered upon, by the conveyance of other lands not covering the tract thus entered upon.

We have examined the other three cases cited and find no authority for the principle above stated.   It is there laid down that a party entering under color of title becomes seized according to his title, and that a person having title and a right of entry is supposed to have entered and to have become seized according to his title, and that an actual entry upon the premises by the plaintiff is not necessary when he has the title and the right of entry.   It is also held in numerous cases cited in the former opinion, page 254, that possession is evidence of seisin as against a party having no title.

In *Woods* v. *Banks*, 14 N. H. 101, it is expressly held that a deed cannot be color of title beyond what it purports to convey.   There the plaintiff entered upon a lot of land under a claim of right and surveyed it and marked the lines of it by spotting trees around it; this was held to be such a possession of the whole lot, that the plaintiff could maintain trespass against a party entering subsequently without right or title, though such possession would not be a good adverse possession against the true owner.

In this case there was no such taking possession of any particular lot and marking it out, so that Bellows could have maintained an action against any one for acts upon any other land than what he actually occupied, provided such land was not covered by his grant.   Suppose Bellows had conveyed to this plaintiff just the land he had occupied by metes and bounds, and suppose his possession was so far evidence of title that his deed thus given would be evidence of title to his grantee, yet what color of title has this plaintiff to the *locus in quo* under a deed of some other piece of land not including the premises in question?

If John Bellows had conveyed to plaintiff, even by a quitclaim deed, " the summit of Mount Washington," and then showed an actual entry on such summit by himself before he conveyed, such deed might give plaintiff the benefit of Bellows' possession.   But Bellows has conveyed by quitclaim deed Thompson & Meserve's Purchase only, and upon this an entry had been made which being under color of title would be good to give the party entering or his grantee Bellows or this plaintiff, constructive possession of the whole lot, but such a deed could not give the plaintiff the benefit of Bellows', or his grantor's, entry upon some other lands not included in the deeds, for there can be no constructive possession of land without color of title.  *Riley* v. *Jameson*, 3 N. H. 23 ; *Enfield* v. *Day*, 7 N. H. 468 ; *Hoag* v. *Wallace*, 28 N. H. 547.

If Bellows has had a possession of the summit of Mount Washington sufficient to enable him to maintain trespass against a person entering subsequently without right, and this summit is not within the limits of Thompson & Meserve's Purchase, then Bellows has never conveyed to this plaintiff any right which such possession would give him to the

summit, but Bellows may still sue any party who has entered subsequently to him without title.

He has only conveyed Thompson & Meserve's Purchase to plaintiff, and until there is some evidence to show that the summit of Mount Washington is within the limits of this purchase, we are unable to see what right this plaintiff has to it by virtue of a deed of that purchase only. Thompson entered upon the premises described in the Willey deed, and would have constructive possession of the whole land thus conveyed, but until there is some evidence tending to show that the summit of the mountain is included in and covered by his deed, he can have no color of title to aid his possession.

The authorities relied on by plaintiff to sustain his position are, *Poor v. Gibson*, 32 N. H. 417; *Jakeway v. Barnett*, 28 Vt. 324 and *Burton v. Le Zelle*, 16 Vt. 158. But *Poor v. Gibson* only holds, as the doctrine of the case is fairly stated in Morrison's Digest, page 544, that plaintiff having a deed of lot No. 6, entered under it upon what he claimed by definite boundaries as being a part of it, the extent of the lot being matter of reasonable doubt: *Held* that he might maintain trespass against any stranger without title who had interfered with his possession whether the land was actually a part of lot No. 6, or not. That case only goes to the extent, that, if Bellows actually entered upon land claiming it to be his under a deed, he could maintain trespass against any one entering without title subsequently upon the land thus actually occupied by him, whether such land was included in the deed or not.

This is not doubted. *Burton v. Le Zelle* only settles that the owners of adjoining lots may settle the line between them by agreement and acquiescence, and when they have thus settled it, their lots will be bounded by that as the true line instead of the original line, when it is found that the agreed line differed from the original line; which is no authority for this case, for there the parties simply held to the agreed line instead of what would have been the line, if the parties had never fixed one by such agreement.

*Jakeway v. Barnett* was a case of a disputed boundary line between two lots, and the jury found that Gibbs, the defendant's grantor, had actually occupied the strip of land in dispute, claiming that his deed covered it; that he had thus occupied it more than fifteen years, and had thereby in that State gained a title by adverse possession, as against the owner of the adjoining lot; and after having thus occupied under such claim he conveyed his lot to the defendant. It was a case where the court say, in the opinion, that the boundary given by the deed is somewhat equivocal, and where its true original construction is now stoutly contested. The court held that defendant was properly entitled to stand upon and hold to the boundary to which Gibbs had thus claimed and occupied.

In the course of the opinion the court say that the only question that seems to have been made at the trial was whether Gibbs, not having any color of title to the strip of land in question, could gain a title by an adverse actual occupancy, of which there was no doubt there or

here. This case where the line in dispute was doubtful, and where the defendants' grantor had actually occupied claiming title, until he had acquired a title by such adverse possession, even though the strip of land in dispute should be held to have been originally covered by the deed of the other lot; a case, as the court say, where the boundary line had been settled by occupation and afterwards the land had been conveyed according to such boundary, is not in point to establish or sustain the doctrine here contended for by the plaintiff.

The question involved in that case is clearly one of a disputed boundary line between two lots of improved and cultivated land, where it is held that the parties may, by agreement or by adverse use and occupation, establish a line between them by which they shall both be bound though it may differ from the original line.

But that principle can hardly have an application to large tracts of wild land, where neither party has had anything but a constructive possession of their lots, where the lines have never been run or attempted to be run according to the grants, and where the parties have never agreed or attempted to agree upon any line between them, and where it must depend upon actual survey to establish the fact whether the tract which the plaintiff claims is bounded on the south by Sargent's Purchase or by lands of the State.

This point was not at all considered in the former opinion, indeed the case does not show, that the point was taken, or in any way alluded to by counsel, and hence we should not probably feel ourselves barred from a reconsideration of the point under the peculiar circumstances of this case.

Our impression is that any right which John Bellows acquired by any entry upon or possession of the summit of Mount Washington cannot be held to have passed to this plaintiff under his deed of Thompson & Meserve's Purchase until there is some evidence that the grant to Thompson and Meserve covered and included this locality.

It has been held in this State that when a demandant has a conveyance from one who was in actual possession *under color of title*, this is equivalent to an actual possession in the demandant himself; *Bailey* v. *March*, 3 N. H. 274; *Buck* v. *Young*, 11 N. H. 485; and that a quitclaim deed from one who has possession *under color of title* transmits that possession; *Edmonds* v. *Griffin*, 41 N. H. 530; and that a deed of a lot of land from a party who has made an entry and survey of the whole lot, may give color of title to the whole; *Woods* v. *Banks*, 14 N. H. 101; *Farrar* v. *Fessenden*, 39 N. H. 280; *Cobleigh* v. *Young*, 15 N. H. 493.

And as possession is evidence of title whether of real or personal property, and conclusive evidence, unless impeached or explained; *Stevens* v. *Reed*, 37 N. H. 53 and cases cited; the actual possession of a lot of land, and the conveyance by quitclaim of that lot by the party thus possessing, might convey such possessory right to so much of the land as had been actually occupied, to the plaintiff; but it would seem little less than an absurdity to hold that a conveyance of some other lot which might or might not adjoin the one in controversy, could

give any right to a lot not thus conveyed. We think that the motion for a nonsuit should have been granted upon the facts as they stood at the time the motion was made.

9. We see no objection to the copy of deed from Willey to Sargent. It was not the middle link in the chain of plaintiff's title, but it was the first; and the rule is that if the last link is proved genuine, if the original deed to the plaintiff is produced and properly proved, copies may be introduced to prove all the other links in the plaintiff's chain of title, including the first. Besides it was afterwards proved that the original deed was lost, and therefore secondary evidence of its contents was properly admitted, and still further, the same question seems to be settled in the former opinion.

10. The objections to the Williams deed do not at first view seem to be well taken. The deed purports to convey just what was taxed, to wit, the unincorporated and unorganized tract of land known as Sargent's Purchase, and would not include in its description any portions that had been annexed to Jackson or Bartlett, nor does it become by any means certain from the testimony of the witness that anything more was in fact sold; but as that matter may not be certain upon the testimony, it was perhaps well enough to submit that question to the jury; nor do we see any particular objections to the instructions given upon that point.

We have not given much attention to these eight objections to this deed or to any of them but the seventh. It may be proper to remark in relation to all of them, that they are not made by any party who appears to have any interest in the land described in the deed or in the sale of the same for taxes, and that so long as the plaintiff shows no title to the premises in question, he is in no position to raise any objections to the defendants' title. No parties interested as owners of the land sold for taxes, have objected or do object that the sale was not legal and proper; and so long as that is so, it does not lie in the mouth of third persons, who show no title or interest whatever in the premises sold, or in the land here in dispute, to object to the sale, or the form of the deed, or to any of the proceedings connected with such sale. The plaintiff must first show that the summit of the mountain is included in the grant to Thompson & Meserve; and then it must appear that Sargent's Purchase, with such additions on the north and adjoining Pinkham's Grant as are proved to belong there, will also include and cover the same summit, so that the plaintiffs will be in danger of losing something which his deed conveys to him, in consequence of the priority of the grant to Sargent, before plaintiff will show any such interest or title as will authorize him to inquire farther than as to the authority to convey and whether there was a conveyance under that authority. *Thompson* v. *Carr*, 5 N. H. 517.

Until such proof is made the defendants' title is well enough, because the plaintiff is an entire stranger to the same. But if the plaintiff should make the proof suggested, and show his title to the premises in question under his grant, and the other proof should also be introduced, viz., that the grant to Sargent also covers the same premises, then the

plaintiff will have such an interest that he may require the defendants to show that the authority under which the sale was made was strictly pursued. *French* v. *Eaton*, 15 N. H. 343; *Wellington* v. *Gale*, 13 Mass. 483; *Smith* v. *Bodfish*, 27 Maine 289.

The seventh objection was not well taken. This objection was that the copy of the warrant sent to the deputy secretary of state was sent back to the sheriff instead of a copy of that copy as required by law. The statute of July 4, 1829, (N. H. Laws 1830, page 563), provides that the collector of said taxes shall on, &c., deliver to the deputy secretary for the time being "a copy of his list" of all such taxes made out as aforesaid and signed by the selectmen, &c., and the said deputy secretary shall keep "said list," &c., and receive the taxes therein contained, &c., and after the first day of September, on application, &c., said deputy secretary shall return to said collector "a copy of his list aforesaid" and the money he shall have received thereon, &c. Whether the deputy secretary is to return the original copy of the list or a copy of the copy which is in one place termed a list, is not clear from the wording of the statute, and we think the law would probably be sufficiently complied with by a return of either the copy of the list, or a copy of the copy which is in the same section improperly called the list. But upon the whole we think that the course was followed in this case which the statute intended should be pursued, for the same section goes on to provide that any collector who may have received "copies of their lists" from said deputy secretary, shall publish, &c., thereby showing that it was a copy of the collector's list, that was to be returned instead of a copy of that copy, as claimed by plaintiff.

And the Revised Statutes which did not evidently intend to change the law, in this respect, make the matter certain by providing that said deputy secretary shall return "said copy," that is, the one he received from the collector. The proceedings in this respect on the part of the sheriff were well enough.

11. The plans were properly introduced as tending to show an allotment. See former opinion.

12. The record from the Secretary of State's office of the deed from Willey to Thompson & Meserve, was properly introduced and also the record from the Coos County Registry. The original deed was lost and these both were or purported to be copies of said deed, but they differed in the description of the grant in a material point. Both were secondary evidence of the contents of the deed, and upon all this secondary evidence it was for the jury to find what the original deed was.

13. We think the act of 1786 appointing Buckman and others to sell certain State lands was properly admitted, with a view of showing that previous grants had been made of the lands which were covered by Sargent's purchase.

14. An important question is here raised in regard to the admissibility of a copy of a deed to prove not only the existence but the proper execution and delivery of an original deed. Here the proper evidence was offered of an unavailing search for the original deed where it should have been, or would be likely to have been found and the ob-

jection that no part of Sargent's Purchase could be proved to have been previously granted was properly overruled.

It is well settled that after proof of the original deed to himself or of his title by descent or devise, a party may use an office copy of a deed to which he is not a party but which constitutes a part of his chain of title, as *prima facie* evidence, without showing the loss of the original and without proof of execution or delivery. *Harvey* v. *Mitchell*, 31 N. H. 582 ; *Horner* v. *Cilley*, 14 N. H. 85 ; *Farrar* v. *Fessenden*, 39 N. H. 269 ; *Forsaith* v. *Clark*, 21 N. H. 409 ; *Stevens* v. *Reed*, 37 N. H. 53.

In *Southerin* v. *Mendum*, 5 N. H. 428, it seems to be held that a party may prove the contents of the deed to himself by a copy when the original is lost, without proof of the execution of the original. But it would not now be recognized as a binding authority to that extent. We see no reason why the party should not be held to prove the execution of the original deed by a subscribing witness, when it can be done as much when the copy is used as when the original is produced and used, and when a party wishes to prove title in a third person, not in the chain of his own or his adversary's title a copy is not admissible until the original has been sought for and proper effort made to obtain it, and then if the copy is used it is only to prove the contents of the original, after proof that such original was properly executed. *Pollard* v. *Melvin*, 10 N. H. 554.

In *Uram* v. *Ingalls*, 18 N. H. 612, it is said that an office copy of a deed to a party to the suit, which is regularly recorded, may, after notice to the party to produce the original, be used by the other party to show the execution of the deed ; but this will not show any delivery of the deed without other evidence. But this is upon the principle that slight evidence is sufficient against a party who withholds that which is the best.

In *Melvin* v. *Marshall*, 22 N. H. 383, it is held that the subscribing witness should be called when the original is lost, and a copy produced, the same as he must be if the original were produced. Perley, J., says : " In this State it is believed to have been the practice in case of a lost deed, to prove the execution by the subscribing witness as where the original is produced ; to give in evidence a copy from the records, with such other proof as the party was able to produce, to show that the deed recorded was the same that the witnesses had seen executed ;" and he says that the court consider this the proper course to be taken. So in *State* v. *Shinborn*, 46 N. H. 503, Bellows, J., says : " Where a writing is lost the evidence of its execution must in general be the same as where it is produced, with the exception of what may be derived from comparison."

There is great looseness and apparently some conflict in the authorities, as to how far an office copy of a deed, when not used in a chain of title, shall be allowed to be evidence of the execution of the original deed, but it is believed that when a copy is not thus used in a chain of title, it is evidence only of the contents of the paper of which it is a copy ; and that whatever proof of execution would be needed, if the

original was produced, should also be required in case the copy is used.

In *Felton* v. *Pitman*, 14 Geo. 530 it is held, (Lumpkin, J.,) that if a deed be lost, the subscribing witnesses must first be called, if known, unless dead or insane or beyond the jurisdiction of the court, but if the subscribing witnesses are not known, other testimony is admissible to prove the execution. So in *Marriner* v. *Saunders* 5 Gilman Ill. 113, the court say (Eaton, J.) : "The execution of a lost deed must be quite as strictly proved as if the deed were produced in court."

In *Dunlap* v. *Glidden*, 31 Maine 510, it is held that "a conveyance of land cannot be proved by parol evidence of the contents of a .lost paper, unless it be proved that the paper was a deed legally executed."

If the original has been lost or destroyed and two or more parts have been executed, the loss or destruction of all the parts should be proved before secondary evidence of the contents can be received, and the original deed ought to be proved to have been duly executed, unless proof of the execution would be dispensed with, if the original itself were produced, or unless the want of the original is occasioned by the default of the other party ; in which case the execution may reasonably be presumed against him. So when an original note of hand is lost, a copy cannot be read in evidence until the original note is proved to be genuine. 1 Phil. Ev. (C. & H.) 452 ; *Goodier* v. *Lake*, 1 Atk. 446 ; *Batchelder* v. *Nutting*, 16 N. H., 261, and cases cited.

The course of proceeding in such cases is stated in *Hewes* v. *Wiswall*, 8 Greene 94, where the demandant in a real action, having produced an office copy of his title deed, and proved that the original once existed, and was genuine, and that the subscribing witnesses were out of the jurisdiction, and having made affidavit of the loss of the original, was permitted to read the copy in evidence ; *Peck* v. *Clark*, 18 Texas 239 ; so in *Kimball* v. *Morrill*, 4 Greene 370 ; the court say, (Preble, J) : " When a party, on an issue to the country, would avail himself of an instrument in writing, lost by time and accident, he should first prove that an instrument was duly executed, with the formalities required by law, and secondly that the instrument so executed has been lost. Then and not till then, he is permitted to give evidence of its contents."

In 3 Phil. Ev. (C. & H.) 1220, Note 865, the course of proceeding in cases of lost instruments is stated and the authorities cited, and the rule is stated to be that where secondary evidence of an instrument is admissible, the execution of the original must in general be proved. If the lost bond or deed was attested by witnesses, they should be called, or an excuse rendered for their absence, before other testimony can be received. That when witnesses cannot be produced, the confessions of the opposing party, the admissions of the existence of such instruments are a species of evidence often resorted to in establishing the genuineness of lost instruments. But that when no direct testimony on the point of execution or former existence of an instrument appears to be attainable, the fact may be proved by circumstances.

As bearing upon this last point see *Sicard's Lessee* v. *Davis*, 6 Peters (U. S.) 124 ; *Jackson* v. *Woolsey*, 11 Johns. 446, 454 ; *Mont-*

*gomery* v. *Dorion*, 7 N. H. 475, 483; *Forsaith* v. *Clark*, 21 N. H. 418; *Neally* v. *Greenough*, 25 N. H. 331; *Downing* v. *Pickering*, 15 N. H. 344; *New Boston* v. *Dunbarton*, 15 N. H. 344; *Colby* v. *Kenniston*, 4 N. H. 262.

As to proof of *delivery* as well as execution we have examined the authorities and find the great weight of authority to be that when a deed is shown to have been properly executed, acknowledged and recorded, that is *prima facie* evidence of its delivery; but that this *prima facie* case may be rebutted by proof. Some of the authorities go so far as to hold that the simple record of a deed is such *prima facie* evidence of delivery, but we think that would be too loose a doctrine to be applied with safety.

We think the principle is correctly stated in *Bigler* v. *Cloud*, 14 Penn. 361, where the court say, (Coulter, J.) : "The crowning act in the execution of a deed is its delivery. But it is not necessary to prove the actual manual investiture. The delivery may be inferred or presumed from circumstances. Thus the signing, the attesting by witnesses, the acknowledgment by the grantor and the recording of the deed have been considered full *prima facie* evidence of delivery." But the evidence is not conclusive. *Juvenal* v. *Jackson*, 14 Penn. 524; see also *Hammill* v. *Hammill*, 19 Ohio 17; *Stewart* v. *Reddett* 3 Md. 67–77; *Warren* v. *Jacksonville*, 15 Ill. 236; *Mitchell* v. *Ryan* 3 Ohio N. S. 317; *Bulkeley* v. *Buffington*, 5 McLean 457; *Loomis* v. *Pingree*, 43 Maine 299; *Ward* v. *Fuller*, 15 Pick. 185; *Bentley* v. *Atwell* 12 Call. 281.

We think the ruling of the court in this case excluding these copies was correct as the case then stood. For it does not appear that there was not other and better evidence of the existence and execution of the deeds which might have been produced. The subscribing witnesses must first be called, if living and within the jurisdiction. The grantor might next be called and then the grantee, but if none of these could be found, any person who had ever seen the original and could testify as to the handwriting of the witnesses or the grantor as it seems. The officer who recorded it, if living, might show something of it. We do not mean to decide that the evidence which defendants offered might or might not be sufficient to warrant its admission, if it had been made to appear that no other evidence was in existence, and in reach of the party, upon making reasonable search and inquiry.

As stated in the note to Phil. Ev. *supra*, it must be made to appear that no direct evidence on the point of execution or former existence of the deed is attainable, before the fact can be proved by circumstances; and the circumstances of each case would probably differ from those of every other case, and no rule can be laid down that would apply to all.

15. Plaintiff's exception to the introduction of the act incorporating Adams (now Jackson) was properly overruled. No notice was required, as this evidence was not covered by the agreement.

16. The court ruled correctly in giving construction to the grant of Adams, where it run *by* State land; that would, by the ordinary use of terms, exclude the State land. 2 Hilliard on R. P. p. 349, sec. 114 and

cases cited.   He says, in speaking of words used to express boundaries, *to*, *from* and *by* are terms of exclusion, unless by necessary implication they are manifestly used in a different sense.   *Breck* v. *Young*, 11 N. H. 485 ; *Enfield* v. *Day*, 11 N. H. 520.

17.   The ruling as to the west line of Jackson, that the charter would govern rather than the plan of 1806, unless the town was run out and located by marking the lines about it, about the time of the making of the plan, which lines varied from the charter.   If there was in fact a practical location of the town under the charter, with lines marked and well defined but varying from the charter, such actual location might govern.

18.   The ruling that the old plan of 1806 had no legal tendency to show that a line was run and marked on the ground by monuments in accordance therewith, was wrong.   This plan of 1806 was *prima facie* evidence of the true lines between the towns and was competent to be submitted to a jury, as tending to show the lines between lands of individuals whose lots are bounded on the town lines.   *Adams* v. *Stanyan*, 24 N. H. 405.   This map was probably made in pursuance of an act of the Legislature of December 30, 1803, making it the duty of the several towns in this State to cause " an accurate survey of the same to be made" and transmit a map thereof to the Secretary of State "containing the exact limits of said town by careful admeasurements," &c. This act was extended, and this map was made and filed, as may be properly assumed, under its provisions and requirements, by making an actual survey of the town and getting the exact limits of the town by careful admeasurement.   We should usually understand by these expressions, that the survey and measurements were or would be according to some lines actually marked on the ground previously, or if not so marked before, that they would of course be so marked at the time.   Their being designed as lines of the town would be a sufficient reason why they should be so marked if not so marked before.   We think this map had some tendency, made under these circumstances, to show that a line corresponding with said plan was run and marked also upon the ground at that time if not before.

19.   That the selectmen of Jackson in 1825 undertook to run a new town line where there was no line before, and differing from both the charter and the plan of 1806, was evidence of nothing and was properly rejected.   That they perambulated the town line in 1832, following the lines as laid down on the plan, and that they claimed to those lines, might tend to show a practical location according to the plan, and we see no objection to the competency of that evidence ; nor do we see why the fact that people living between the two lines on the south of Jackson, voted and paid taxes in Jackson in 1832 and for several years next preceding, might not have been properly admitted as a circumstance bearing in the same direction, though perhaps practically having no great weight.

20.   The evidence offered as to Pinkham's examination of the land west of Jackson with a view to the construction of his road, was proper-

ly ruled out we think.   His act may have tended to show his private opinion as to where the line run, but it does not appear that he had any knowledge of the fact.

21.   We see no objection to the question to Weeks as an expert.

22.   We do not see the relevancy of the question to Johnson, as to what Barker told him.   Barker had no authority to make admissions or to settle lines that were in dispute, and what he said about it would be the merest hearsay.

23.   The exception to the resolution authorizing the State Treasurer to convey a tract of land to Dorcas Merrill had no foundation.

24.   What Meserve said to Barker about the maple tree being the corner of Sargent's Purchase was incompetent.   Meserve was agent for defendants, *to look after lands, pay taxes and see to trespassers;* whatever he may have done or said beyond that was not within the scope of his authority and could not bind the defendants.   What Pickering said to Barker on the same subject might be competent to show that the maple tree was a corner of the D. Merrill lot as located, but beyond that it was not competent.   He had no authority to fix the bounds to Sargent's Purchase.   What Willey said to Barker about the maple tree being a corner of the Merrill lot could hardly have any bearing, for he did not convey the Merrill lot and could· at most only show that he understood the lot to be located so as to make that a corner.   But the minutes Barker took from Willey show that this is the n orthwest corner of the D. Merrill lot, and not the northeast corner from which the survey of Sargent's Purchase commenced, and the 100th question was properly excluded because it did not follow, if the maple tree was the southwest corner of the Iron Ore Tract as surveyed, that it was the southeast corner of Sargent's Purchase.   The maple tree is the northwest corner of the D. Merrill lot as it is claimed to be located, but the corner of Sargent's Purchase is the northeast corner of that lot, if it goes no farther east than that.   It would seem simply that in running out the Iron Ore Tract they went too far west at least by the width of the D. Merrill lot and overlapped that much upon Sargent's Purchase.

25.   We think the ruling excluding Emery's and Meserve's statements was correct; also most of Meserve's statement that follows was clearly incompetent.   The pencilling on the plan, as stated by Meserve, we think incompetent to prove anything; it was not identified as being the act of any one or as put there for any purpose.

26.   But we pass over the particulars as proved and offered to be proved, to the ruling of the court, that there was no evidence upon which the jury could find that the northwest corner of the Dorcas Merrill lot was the starting point from which to run out Sargent's Purchase instead of the northeast corner named in the deed to Sargent.   What Willey said before the deed to Sargent would be incompetent so far as it did not correspond with the deed afterwards given, and what he said afterwards would be incompetent so far as it tended to contradict the deed he had given, and we think the ruling right in this case as it was on the former trial.

27. We find no objection to questions and answers of Barker except as ruled out as irresponsive to interrogatory 53.

28. Proper questions to an expert.

29. George P. Meserve was called by plaintiff and was then found to be the agent of defendants for certain purposes. Plaintiff then moved for leave to put leading questions to witness, which was denied. That was a matter clearly within the discretion of the court at the trial, and we will not revise it. 1 Phil. Ev. (C. & H.) 269; *People* v. *Mather* 4 Wend. 257; *Stafford* v. *Sanford*, 9 Conn. 284.

30. The admissions of the party were properly received as evidence, but they were not conclusive. *Barker* v. *Holderness*, 44 N. H. 414; *Eastman* v. *Cooper*, 15 Pick. 276, 281, 287. Such admissions would have no weight where it was shown that the admission was made through a mistake or misapprehension of the facts as they were afterwards proved to exist.

31, 32 & 33. As to Bellows' possession of the summit of Mount Washington, this evidence becomes immaterial in the view we take of the case.

34. Evidence once put in may be used for any purpose for which during the course of the trial it may become competent.

35. The bill once pending before the Legislature, but not passed, is no evidence as to the bounds of Thompson & Meserve's Purchase. The original grant defines this Purchase sufficiently, as it would seem, and unless plaintiff desired to have its limits changed, he did not need any legislation on the subject.

36. Relates to Bellows' possession of the summit, and becomes immaterial.

37. Ruling right, but has no application now.

38. The instructions for ascertaining the bounds of Sargent's Purchase were correct—the same as settled in the former opinion.

39. The instructions were correct as to the consideration of the admissions of the party as to the location of the D. Merrill lot. If the admissions were made with a full knowledge of all the facts in the case, then they should be weighed as important evidence against the party making them; but if made under a misapprehension or in ignorance of the real facts, then the force of the admissions might be done away with.

*Case discharged.*